865 F.2d 364
 275 U.S.App.D.C. 145, 57 USLW 2452,
10 Employee Benefits Ca 1689
 Charles S. FOLTZ, et al., Appellants,
v.
U.S. NEWS & WORLD REPORT, INC., et al.
Charles S. FOLTZ, et al.,
John Kirby, Appellant,
v.
U.S. NEWS & WORLD REPORT, INC., et al.
David B. RICHARDSON, et al., Appellants,
v.
U.S. NEWS & WORLD REPORT, INC., et al.
 Nos. 87-7151 to 87-7153.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 3, 1988.
Decided Jan. 13, 1989.
 
 Appeals from the United States District Court for the District of Columbia (Civil Actions No. 84-00447 and 85-02195).
 Alan Raywid and Joseph M. Butler, with whom Margaret E. Haering, John D. Seiver, Susan Paradise Baxter, Washington, D.C., for Charles F. Foltz, and George A. Bangs, Rapid City, S.D., for David B. Richardson, et al., were on the brief, for appellants in 87-7151, 87-7152 and 87-7153.
 Lawrence J. Latto, Leslie A. Nicholson, Jr. and Willis B. Snell, with whom William R. Galeota, Patrick M. Hanlon and Julie M. Edmond, for Profit Sharing Plan of U.S. News & World Report, Inc., et al.; Hannah E.M. Lieberman and Thomas J. Catliota, for U.S. News & World Report, Inc., and The Madana Realty Co.; Steuart H. Thomsen, for American Appraisal Associates, Inc.; Richard J. Wertheimer, Hadrian R. Katz and Edward L. Wolf, Washington, D.C., for director defendants; and Nell B. Strachan, Baltimore, Md., and William D. Quarles, Washington, D.C., for Mercantile Safe Deposit & Trust Co., were on the brief, for appellees in 87-7151, 87-7152 and 87-7153. Mark E. Newell, Washington, D.C., also entered an appearance for appellee Fred Drasner, in 87-7151.
 Before EDWARDS, BUCKLEY and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Appellants are former employees of U.S. News & World Report, Inc. All retired between 1974 and 1982. At their retirements, U.S. News exercised its option to purchase the shares in the company that each had received as part of a stock bonus program. In addition, the U.S. News Profit-Sharing Plan issued retirement benefits to each of them, computed on the basis of their proportional interests in U.S. News stock held by the Plan (virtually its sole asset). The stock was not publicly traded, and in valuing the relevant stock interests for both purposes, the defendants treated them as minority interests, rather than including a "control" premium.
 
 
 2
 The gap between minority and majority valuation proved great because U.S. News, through a subsidiary (Madana Realty), owned a 3.8-acre parcel of real estate in a rapidly developing office district in Washington, D.C., known as the West End. The company used more than half of this land for employee parking, III Joint Appendix ("J.A.") 1044, and carried it on its books at a fraction of its market value. Foltz v. U.S. News & World Report, Inc., 663 F.Supp. 1494, 1503 (D.D.C.1987).
 
 
 3
 U.S. News annually engaged American Appraisal to value the company's stock for purposes of exercising its option to buy the holdings of retiring employees. American Appraisal almost entirely discounted the potential value of the real estate, at least until 1981, because its talks with the company's management convinced it that development plans remained remote and speculative. 663 F.Supp. at 1502-03.
 
 
 4
 The Plan in turn used American Appraisal's share valuation in calculating the severance benefit to be paid to employees who retired, died, or separated from U.S. News in each year.
 
 
 5
 The sale of all of U.S. News's stock in 1984 revealed the significance of these valuation decisions, exposing an immense gulf between the per share realizations of the plaintiff retirees and the beneficiaries of the company's sale. The total sale price was $176 million, or $2,842 per share. Employees who were in active service at the date of the sale, and who held U.S. News stock interests either directly or through the Plan, benefited accordingly. So did company directors, through what the litigants call "phantom stock" holdings[1]--in essence, bonuses in the form of promises by the company to pay the recipient at retirement the per share value of the company's stock at that date, multiplied by the number of "phantom" shares issued to the director.[2] By contrast, valuations for the plaintiff retirees ranged from $65 per share in 1973 to $470 in 1981.
 
 
 6
 In the district court the plaintiff retirees claimed that the defendants' valuation decisions (along with related statements or omissions) breached fiduciary duties imposed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001, et seq. (1982) ("ERISA"), and violated the securities laws.[3] They brought claims against the Plan, the company, Madana Realty, and American Appraisal and also against several former directors of U.S. News (as directors and as Plan fiduciaries). See 663 F.Supp. at 1498 n. 3 (listing individual defendants). The trial court ruled for defendants on each count of the complaints. We affirm.
 
 Our analysis proceeds through these steps:
 
 7
 1. U.S. News's purchase of stock from retiring employees were clearly purchases of minority interests and, under Article Fifth (e) of its Certificate of Incorporation, could not have been valued otherwise.
 
 
 8
 2. For the Plan's computation of retiring employees' interests in the Plan's U.S. News stock, the governing Plan document directed the Plan to use "the fair market value established" under Article Fifth (e). That valuation technique, further, accorded with one of the key purposes of the Plan--to perpetuate employee ownership of the company. Thus minority valuation complied with the explicit directive of the Plan document and also tended to fulfill its general purposes.
 
 
 9
 3. As ERISA instructs fiduciaries to carry out the aims of the Plan that they administer, it did not prohibit the fiduciaries' action. Nothing in ERISA contradicts the directive of the Plan document or the congruence of minority valuation with its purposes.[4]
 
 
 10
 I. U.S. NEWS'S EXERCISES OF ITS PURCHASE OPTION
 
 
 11
 A 1962 reorganization of U.S. News created two classes of shares, Common and Class A. All shares of both classes had equal voting rights. The only difference was that Class A shares had a non-cumulative dividend preference of $2.00 per share per year and could be held only by the U.S. News Profit-Sharing Plan. III J.A. 936. Class A shares were designed to convert automatically to Common if they were acquired by anyone other than the Plan. U.S. News Certificate of Incorporation, Article Fourth (d)(ii).
 
 
 12
 As part of the 1962 reorganization, those employees who owned shares in the predecessor corporation were issued a total of 108,000 shares in the new company. About two-thirds of the shares in the predecessor company had belonged to the company's founder, David Lawrence, and to his family; the company purchased these shares for cash and for notes that it repaid by 1967.
 
 
 13
 After the reorganization, employees could acquire additional direct ownership of shares only through U.S. News's stock bonus plan. All employees were eligible to participate. I J.A. 168. U.S. News gave bonus shares to employees in the fifth year of their employment, and every five years thereafter. It calculated the dollar value of the shares to be awarded according to a consistent formula: the longer an employee's length of service, and the greater his salary, the larger the dollar value of the quinquennial bonus. U.S. News then divided this dollar figure by the current appraised value of a share to arrive at the number of bonus shares it would award the employee that year.
 
 
 14
 In order to keep the beneficial ownership of the company lodged among its active employees, Article Fifth of the U.S. News Certificate of Incorporation required employees to offer to sell their shares back to the company if the employee left for any reason, including retirement. The option price was to be established by an independent appraiser, according to a procedure spelled out in Article Fifth, paragraph (e):
 
 
 15
 (e) Option Price. The option price of stock shall be its fair market value as of the date of exercise of the option....
 
 
 16
 Fair market value as of any date shall be the fair market value agreed upon by the parties, or in the absence of such agreement, determined as follows: The board of directors of the corporation shall select each year a qualified appraiser of national standing, who shall, as soon after the close of each fiscal year of the corporation as complete financial statements are available, determine the fair market value of the stock of the corporation as of the close of such fiscal year. Such fair market value shall be determined without regard to the restrictions on transfer of stock contained in this Article. In making such appraisal the appraiser shall use methods and standards recognized by the regulations of the United States Internal Revenue Service as appropriate for determining fair market value of corporate stock.... The market value per share so determined shall be the option price ...
 
 
 17
 Article Fifth (e), III J.A. 918-19 (emphasis added). Article Fifth (e) also included a procedure by which aggrieved employees could contest the appraisal, but the parties agree that no employee invoked it during the period over which plaintiffs retired. Appellants' Joint Br. at 8, Appellees' Joint Br. at 25. Between 1962 and the retirement of the last retiring plaintiff, U.S. News always exercised its Article Fifth (e) purchase option. 663 F.Supp. at 1500-01.
 
 
 18
 Although plaintiffs make a game try, it seems quite plain that U.S. News acted properly in adopting a minority valuation for the small lots of bonus stock that it purchased from employees. Article Fifth (e) gives the appraiser two instructions on the subject. The appraiser is to assume that the stock could trade freely (i.e., ignore the fact that the Certificate of Incorporation limited stockholders' power of alienation), and to "use methods and standards recognized by the regulations of the United States Internal Revenue Service as appropriate for determining fair market value of corporate stock." Neither point provides any basis for valuing on a majority basis lots that were obviously minority.
 
 
 19
 The parties and the trial court all agreed that whatever enlightenment is available from the IRS was embodied in Rev.Rul. 59-60, 1959-1 Cum.Bul. 237, and in the cases interpreting this pronouncement on the valuation of stock for estate tax purposes. We shall revisit Rev.Rul. 59-60 and those cases shortly, but for present purposes it is enough to say that no one here even argues that it could require assignment of a control premium to non-control stock.
 
 
 20
 Plaintiffs argue that because Article Fifth (a) defines "stock" as comprising both Class A and Common stock, it follows that the phrase "stock of the corporation," as used in Article Fifth (e), must refer to all the company's stock and that the entirety of its stock would necessarily entail control. Support for the notion that the valuation is to encompass all of the company's stock lies in the fact that Class A stock could be held only by the Plan, not by an individual, so that the phrase in Article Fifth (e) seems to encompass stock that in the nature of things would never be directly covered by the purchase option. We think the reading very strained. Plaintiffs suggest no reason whatsoever why the framers of the clause could possibly want minority shares valued on a majority basis.
 
 
 21
 Other circumstances also cut against such a reading. It is clear from the Certificate of Incorporation and is conceded by plaintiffs that the framers of the arrangement sought to perpetuate employee ownership and control. Valuation on a majority basis would be inconsistent with the implicit assumption that the company would not be sold, as a control premium is in the nature of things realized only at the moment of sale. In addition, the liquidity problems that plaintiffs' reading might engender for the company could imperil continued employee ownership.
 
 
 22
 Rejecting plaintiffs' strained reading of Article Fifth, we conclude that U.S. News quite properly valued the stock bonus shares on a minority basis.
 
 
 23
 The plaintiffs further argue that even if valuation of the shares on a minority basis was proper, the huge discount that American Appraisal applied to the potential value of U.S. News's West End real estate was unreasonable. After reviewing the testimony of the expert witnesses, the district court found that American Appraisal's decision to give some, but very limited, weight to the value of the real estate "adequately took account of the Company's underlying assets." 663 F.Supp. at 1531. We find no error here. In view of U.S. News's often-stated unwillingness to develop the West End real estate, a purchaser of a minority interest in the company would likely have drastically discounted the possibility of a change of mind. And only a decision to develop the real estate in the fairly near future would enable it to contribute very substantially to the discounted present value of the expected returns on a minority share of U.S. News stock. See Citizens Bank & Trust Co. v. Commissioner of Internal Revenue, 839 F.2d 1249, 1251, 1254 (7th Cir.1988) (discussing propensity of investors to heavily discount future returns, especially those beyond their control). Cf. Estate of Watts v. Commissioner of IRS, 823 F.2d 483 (11th Cir.1987) (arms-length transaction would value interest in partnership at "going concern value" not higher "liquidation value" when liquidation was unlikely and interest transferred did not carry power to force liquidation).
 
 
 24
 II. VALUATION OF PROFIT-SHARING PLAN SHARES: THE PLAN'S MANDATE
 
 
 25
 All employees with one or more years of service participated in the Profit-Sharing Plan and thereby enjoyed a derivative interest in the Plan's U.S. News stock. Their interests vested fully after ten years' employment. 663 F.Supp. at 1501. Although each Member had an individual "account" representing his or her share of the Fund, the Plan Document clearly defined each participant's interest as "the value of his undivided share" of the Fund. III J.A. 926 (emphasis added).
 
 
 26
 The Plan purchased 30,000 Class A shares in 1962 on the occasion of its creation and U.S. News's reorganization. At the time that amounted to about a 23 percent interest in the company. 663 F.Supp. at 1500. Although U.S. News continued to issue stock bonuses thereafter, repurchases evidently exceeded issuances; in any event, the Plan's percentage of outstanding stock gradually increased. In 1966 it bought 20,000 more Class A shares (at $80 a share), bringing its holdings to 50,000 shares, or 45 percent of the 110,574 shares then outstanding. Id. at 1501. In 1971 the Plan's 50,000 share block became a majority of U.S. News's outstanding shares. Id. The relative size of the Plan's block continued to grow. By April 1975, for example, employees' direct holdings were only 17,444 shares. III J.A. 935.
 
 
 27
 The Plan document explicitly provided that, for purposes of computing a departing employee's retirement benefit, the Plan Trustee should use "the fair market value established under Article Fifth, Paragraph (e)" of U.S. News's Certificate of Incorporation:
 
 
 28
 For all purposes of the Plan, the market value of shares of stock of the Employer, which are held by the Trustee as a part of the Fund, shall be the fair market value established under Article Fifth, Paragraph (e), of the Certificate of Incorporation of U.S. News & World Report, Inc..... The Committee shall be fully justified and exonerated in relying on the figures so provided by the Board of Directors and/or the appropriate financial or accounting officer of the Employer, and the Trustee shall be fully justified and exonerated in relying on the figures so provided by the Committee, as to the accuracy of the figures and as to the compliance with the aforesaid provisions of the Certificate of Incorporation.
 
 
 29
 Profit-Sharing Plan, Art. VI, Sec. 6.3, III J.A. 924-26 (emphasis added).
 
 
 30
 Each year the Plan in fact used the per share dollar value that American Appraisal had computed for U.S. News under Article Fifth (e). The plaintiffs agree that the Plan cross-referenced the Certificate of Incorporation, and that therefore as a matter of trust and contract law the fiduciaries were right to adopt the company's valuation; as we have seen, however, they thought that the latter should have been on a majority basis. Our rejection of the latter view of course dooms their claim that the Plan document required valuation on a majority basis. It is true that the Plan's reference to each participant's "undivided" share in the whole suggests that the Plan's assets could have been totalled up--on a majority basis--and then apportioned to each employee in pro rata shares. But the Plan's express direction to accept the valuation made by the company for purchase of bonus stock--a direction not merely conceded but embraced by plaintiffs--clearly controls over any emanations from the choice of these terms for description. As a matter of contract and trust law, therefore, the Plan correctly used a figure computed on a minority basis.
 
 III. THE EFFECT OF ERISA
 
 31
 We turn now to the plaintiffs' argument that if the Plan be construed to permit valuation on a minority basis, it violates ERISA. The parties agree that the Plan is subject to ERISA, which preempts state law governing employee benefit plans (with limited exceptions not relevant here). See ERISA Sec. 514, 29 U.S.C. Sec. 1144 (1982); Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987) (ERISA's civil enforcement remedies in Sec. 502(a), 29 U.S.C. Sec. 1132, are exclusive). Thus ERISA frames the duties that the Plan's management owned participants. ERISA creates a cause of action for benefits due, whether under the terms of the Plan itself or because some term of the Plan conflicts with ERISA. Pilot Life, supra.
 
 
 32
 While trust documents cannot excuse trustees from ERISA duties, Central States, SE & SW Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 568, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985), rights under ERISA are largely defined by the plan document, Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). Plaintiffs claim to find in ERISA, however, three sources of a duty to use a majority valuation, strong enough in their view to overcome the terms of the U.S. News Plan: (1) an implied incorporation of IRS valuation techniques, which in their view compelled valuation on a majority basis; (2) ERISA's mandate that a plan fiduciary "discharge his duties ... solely in the interest of the participants and beneficiaries," ERISA Sec. 404(a)(1), 29 U.S.C. Sec. 1104(a)(1); and (3) ERISA's requirement that it file an annual report containing a statement of its assets and liabilities "valued at their current value," ERISA Sec. 103(b), 29 U.S.C. Sec. 1023(b)(3)(A) (1982). We work through them in that order.
 
 
 33
 Internal Revenue Service rules. Although ERISA at no point relevant here incorporates the Internal Revenue Code or IRS regulations, courts have on occasion found the regulations of useful guidance in addressing problems under ERISA that parallel issues under the Code. See, e.g., Tulley v. Ethyl Corp., 861 F.2d 120, 125 (5th Cir.1988); Rose v. Long Island R.R. Pension Plan, 828 F.2d 910, 917-18 (2nd Cir.1987) (adopting IRS definitions of "agency" and "instrumentality" into ERISA); see also Alessi, 451 U.S. at 517-21, 101 S.Ct. at 1903-05 (interpreting ERISA provision against discrimination in pension plans as endorsing view taken in Treasury regulations and IRS rulings applying Internal Revenue Code's parallel non-discrimination requirement for plans to qualify for favorable tax treatment). We will assume potential relevance here and consider the possible import of Rev.Rul. 59-60.
 
 
 34
 The ruling unquestionably suggests that control may justify higher valuations for a specific block of shares:
 
 
 35
 The size of the block of stock itself is a relevant factor to be considered. Although it is true that a minority interest in an unlisted corporation's stock is more difficult to sell than a similar block of listed stock, it is equally true that control of a corporation, either actual or in effect, representing as it does an added element of value, may justify a higher value for a specific block of stock.
 
 
 36
 Rev.Rul. 59-60 at Sec. 4.02(g), 1959-1 Cum.Bul. 237, 238-39.
 
 
 37
 In the estate tax context for which Rev.Rul. 59-60 was drafted, the courts have taken the view that valuation of a decedent's control block of shares should include a control premium. This applies even though the will itself may split the control block among legatees. See Estate of Curry v. United States, 706 F.2d 1424, 1428 (7th Cir.1983) (applying control valuation to decedent's non-voting shares because of his ability to sell them as a block with voting shares). It thus represents a decision that for estate tax purposes control at the moment before death calls for imputation of a control premium even if death and the will or intestacy will destroy control. In that context, as Curry pointed out, any other rule would enable decedents to artificially reduce estate taxes by splitting interests in anticipation of the legatees' reassembling them. Id.; see also Citizens Bank & Trust Co. v. Commissioner of Internal Revenue, 839 F.2d 1249 (7th Cir.1988); Ahmanson Foundation v. United States, 674 F.2d 761, 767-69 (9th Cir.1981). Moreover, the estate tax is ordinarily conceived as falling on the decedent's passage of property, not upon the legatees' receipt. See, e.g., Ahmanson Foundation, 674 F.2d at 768.
 
 
 38
 Here the reigning conception is quite different. As we noted in our original consideration of Article Fifth (e) of the Articles of Incorporation, the architects of U.S. News's 1962 reorganization, which included the Plan, saw as a major objective the establishment and perpetuation of employee ownership. Foltz, 663 F.Supp. at 1500; see also U.S. News's Articles of Incorporation, Article Fifth at 7-12, III J.A. 916-21. A control premium is realized by sale of a controlling block of stock; the trial court found that the Plan fiduciaries believed that they were not going to make such a sale, and that finding is supported by ample evidence. So long as they expected to carry out the Plan's employee-ownership purpose, it seems clear that the context underlying valuation of the Plan's shares was diametrically opposed to that of the estate tax.
 
 
 39
 We pause to note some tension between this conclusion and some of the explanations for the very existence of control premiums. A leading analysis argues that bidders offer a premium for control because it will enable them to eliminate or reduce "agency costs"--the costs associated with the managers' failure to realize the maximum value of the firm's assets. See, e.g., Michael C. Jensen and William H. Meckling, Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure, 3 J.Fin.Econ. 305, 308-10, 329, 351-52 (1976); see also Saul X. Levmore, A Primer on the Sale of Corporate Control, 65 Tex.L.Rev. 1061 (1987). There is some irony in allowing plan fiduciaries--who here overlap largely with corporate management--to deny retiring employees the benefit of firm assets that could have been realized by management's pursuing a course of conduct that was clearly available--and the availability of which induced the ultimate purchaser to pay a control premium for all the company's stock.
 
 
 40
 Ultimately, however, we are not persuaded that this view of control premiums undermines our conclusion. In the first place, the existence of a control premium should not be conceived as necessarily proving the incumbent managers delinquent: the winning bidder's readiness to offer a premium may stem from its possession of special assets or skills that are uniquely able to enhance the firm's value, and the costs of identifying the synergistic opportunity may have been lower for the winning bidder than for anyone else. Second, even if the control premium is due to incumbent management's lack of acumen, the law provides a remedy for extreme cases--albeit only extreme cases, as the business judgment rule allows the firm's managers great leeway.
 
 
 41
 Most important, however, is that where the controlling instruments contemplate employee ownership, all participants are on notice that maximization of the firm's pecuniary value is not to serve as an exclusive goal. The market for corporate control provides incumbent management a critical incentive to perform well: inadequate performance will induce outsiders to bid for control of the company and to oust them. See Edgar v. MITE Corp., 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982) (noting congressional finding that "takeover bids ... serve a useful purpose in providing a check on entrenched but inefficient management"); see also id. at 643-44, 102 S.Ct. at 2641-42 (recognizing that tender offer mechanism gives management incentive to perform well). To the extent that the investor-workers establish a preference for employee ownership, they blunt the operation of the market for corporate control and diminish the force of its incentive effects.
 
 
 42
 Accordingly, we see no reason why the courts' quite appropriate use of Rev.Rul. 59-60 for estate tax valuations should preclude a plan's use of minority valuation where the Plan document so provides and where the controlling instruments effect a clear preference for employee ownership. The Fifth Circuit has observed that plan fiduciaries do not breach their ERISA duties merely because they fail to follow Rev.Rul. 59-60 "jot and tittle," Donovan v. Cunningham, 716 F.2d 1455, 1473 (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), and we think the point entirely apt here.
 
 
 43
 Thus we find no error in the district court's conclusion that, as applied to this Plan, Rev.Rul. 59-60 does not require a majority valuation. See 663 F.Supp. at 1525-29.
 
 
 44
 The fiduciaries' "exclusive" duty to provide benefits: The retirees rely heavily on ERISA Sec. 404(a)(1), 29 U.S.C. Sec. 1104(a)(1) (1982), which requires a plan fiduciary to:
 
 
 45
 discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 46
 (A) for the exclusive purpose of:
 
 
 47
 (i) providing benefits to participants and their beneficiaries; and ...
 
 
 48
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 
 
 49
 ....
 
 
 50
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].
 
 
 51
 29 U.S.C. Sec. 1104(a)(1) (1982) (emphasis added).
 
 
 52
 The retirees read the italicized phrase as meaning that the Plan fiduciaries had a duty to maximize pecuniary benefits; moreover, they believe that such a duty would invalidate Plan decisions that, effectively, favored later distributees over earlier ones such as themselves. Both steps of the argument fail.
 
 
 53
 Section 404 creates no exclusive duty of maximizing pecuniary benefits. Under ERISA the fiduciaries' duties are found largely in the terms of the plan itself. See Alessi, 451 U.S. at 511, 101 S.Ct. at 1900; see also Edwards v. Wilkes-Barre Pub. Co. Pension Trust, 757 F.2d 52, 56-57 (3d Cir.1985). In using a minority basis for stock valuation, the fiduciaries here sought to pursue the Plan's goal of continued employee ownership. As we have already noted, the control premium is normally realized by sale, an event that would obviously thwart one of the Plan's purposes--perpetuation of employee ownership. Moreover, while obviously evaluation on the basis of a hypothetical sale could co-exist with employee ownership, it could create liquidity problems that would jeopardize that purpose. ERISA, far from manifesting any intention to discourage long-term employee ownership, specifically favors that pattern by exempting Employee Stock Ownership Plans from ERISA's 10 percent cap on plans' holdings of "employer securities." See 29 U.S.C. Sec. 1107(b)(1) (1982) (exempting any "eligible individual account plan," which is defined in id. Sec. 1107(d)(3) as including ESOPs). See also Donovan v. Cunningham, 716 F.2d 1455, 1465-67 (5th Cir.1983). While U.S. News's Plan was not an ESOP, see 663 F.Supp. at 1518 n. 33,[5] ERISA's evident approval of ESOPs precludes any claim that it forbids employee ownership as a legitimate plan objective.
 
 
 54
 Further, even if we supposed that Sec. 404 called for exclusive pursuit of pecuniary advantages for plan beneficiaries, the disputed valuation decisions are consistent with such an aim. The plaintiffs were not the only beneficiaries of the Plan. Plan wealth that was not distributed to them was available for distribution to other Plan beneficiaries. Indeed, the worst that can be said of the Plan is that it was administered to favor a rolling class of future beneficiaries over those present and past. Nothing in Sec. 404 requires that one set of beneficiaries be favored over another. See, e.g., Edwards, 757 F.2d at 56-57.
 
 
 55
 Plaintiffs would also infer from Sec. 404(a)(1)(B)'s requirement that plan fiduciaries exercise the "care, skill, prudence and diligence" of a "prudent man" that we owe their valuation decision no deference, since, they say, the fiduciary standard exacted is "the highest known to law." In support of this view they cite Donovan v. Cunningham, 716 F.2d 1455 (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), and Donovan v. Bierwirth, 680 F.2d 263 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). In fact, however, courts have reviewed ERISA fiduciaries' decisions as to the allocation of benefits among beneficiaries by an "arbitrary or capricious" standard so long as the decisions involved no conflict of interest. See, e.g., Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134 (3d Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1288, 99 L.Ed.2d 498 (1988); Edwards, 757 F.2d at 56; Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 333-34 (3d Cir.1984).
 
 
 56
 Plaintiffs appear to recognize that principle as governing application of the "arbitrary or capricious" standard, but argue that the fiduciaries were subject to a conflict because they sought to continue ownership of U.S. News by its employees. But that interest was not some "outside" concern; rather, by the terms of the Plan, it was was an interest that Plan beneficiaries shared, inseparable from their interests in the Plan itself. This contrasts sharply with Cunningham, where the plan fiduciaries (identical with the firm's board of directors) used plan assets to buy stock from one of their number (chairman of the board of directors and until the purchase the firm's sole shareholder), allegedly at inflated prices, and with Bierwirth, where the fiduciaries and firm insiders acted to defeat a tender offer for the firm's shares that, if successful, would have markedly increased the value of the plan's assets but have jeopardized their personal positions. It is also clearly distinct from the facts of Pilon v. Retirement Plan for Salaried Employees of Great Northern Nekoosa Corp., 861 F.2d 217 (9th Cir.1988), where the court, apparently assuming that more generous payments to a particular retiree might ultimately come from the corporate treasury, see id. at 219, noted that "divided loyalty" increased the likelihood that a decision would be found arbitrary and capricious, id. at 219.
 
 
 57
 In any event, as we regard the fiduciaries' reading of the Plan document as correct and as not countermanded by anything in ERISA, application of even the severest type of scrutiny would not lead us to overturn it.
 
 
 58
 Plaintiffs further invoke Maggard v. O'Connell, 671 F.2d 568, 571 (D.C.Cir.1982), for the proposition that to satisfy even the "arbitrary or capricious" test an ERISA trustee must have taken a "hard look" at salient problems and engaged in "reasoned decisionmaking." We have some hesitation about a wholesale incorporation of administrative law doctrine into judicial review of fiduciary decisions, and note that the issue at stake in Maggard was a factual one--whether an applicant for benefits had worked in coal mines for the requisite number of years. In any event, while it is true here that the Plan fiduciaries here never recorded any deliberations and appear to have pursued the minority-basis valuation more on the basis of inertia than explicit decisionmaking, that is no basis for overturning a decision that is entirely consistent with the Plan document and with ERISA's substantive requirements.
 
 
 59
 ERISA's reporting requirements: Sec. 103(b) of ERISA requires all ERISA plans to publish an annual report containing a statement of the plan's assets and liabilities "valued at their current value." 29 U.S.C. Sec. 1023(b)(3)(A) (1982). Section 3(26) of ERISA in turn defines "current value" as
 
 
 60
 fair market value where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary ... pursuant to the terms of the plan and in accordance with the regulations of the Secretary, assuming an orderly liquidation at the time of such determination.
 
 
 61
 29 U.S.C. Sec. 1002(26) (1982). The Plan, of course, valued itself on a minority basis, while the liquidation value, arguably, would be computed on a majority basis.
 
 
 62
 Since the terms of the Plan by no means contemplated a liquidation, Sec. 103(b)'s directive to "assum[e] an orderly liquidation" is to a degree inconsistent with the requirement of valuation "pursuant to the terms of the plan." Moreover, as Sec. 103(b) is a reporting requirement, we are far from clear that it applies at all to benefit calculations. In any event, assuming the defendants' benefit calculation method deviates from that of Sec. 103(b), we think such a deviation permissible so long as the fiduciaries have not concealed from the beneficiaries the critical facts that expose the possible deviation. Here there was no concealment. The evidence introduced below demonstrates beyond doubt that all employees were aware, or at the very least were on inquiry notice, as to the great gap between the book value of U.S. News's West End real estate and its true value. To take just one example, this disparity was often discussed--though not always at great length--at the annual employee lunch. Written transcripts of these discussions between employees and management were available on request to all employees who were unable to attend. 663 F.Supp. at 1510. As there was no concealment, and as the Plan in good faith reported one measure of its "fair value," we were unable to find an ERISA violation in any possible deviation of the Plan's benefit calculation from the methods appropriate to Sec. 103's reporting requirements.
 
 
 63
 * * *
 
 
 64
 The filings below are reputed to be the largest in any civil case in the history of the district court for the District of Columbia. The district court threaded its way through the maze with patience and skill. We affirm on all counts.
 
 
 65
 SO ORDERED.
 
 
 
 [1]
 Officers as such may also have received phantom shares. The record is unclear. Though phantom shares were evidently conceived as a device for rewarding and encouraging persons who could not hold stock, the record is confusing as to who fell into this category. Compare III J.A. 953 (directors may not buy stock); Appellee's Br. at 5 n. 4 (only directors got phantom shares); and 663 F.Supp. at 1508 (neither directors nor officers may buy, giving no citation for proposition), with U.S. News Certificate of Incorporation, Article Fifth, p 1 (employees may buy stock), and id. at Article Fifth (a) (employee defined to include directors and officers)
 
 
 [2]
 The phantom share program had a ceiling of 2400 shares per director. In 1981, part of the period in which share prices increased rapidly, the directors accelerated the award rate in a manner which had the effect of ensuring that every director, including the new President and Treasurer, who had two and one years of service respectively, reached the 2400-share cap before the sale. This put each director in line to receive about $7 million at the sale price of $2,842 per share. In fact, however, the directors ultimately redeemed their phantom shares at a "price considerably less than" that paid for ordinary stock. See 663 F.Supp. at 1508
 
 
 [3]
 The securities claims are based on alleged nondisclosure by the defendants of the basis on which the valuation was made. We find no error in the trial court's rejection of this claim on the facts. See infra at p. 375
 
 
 [4]
 Our holding on these issues makes it unnecessary for us to reach the statute of limitations defenses
 5 U.S. News's Plan itself was apparently exempt from the 10 percent cap by virtue of 29 U.S.C. Sec. 1107(d)(3)(A)(ii), including profit-sharing plans as eligible individual account plans.