**James P. DeFAZIO, et al., Plaintiffs,**

**v.**

**HOLLISTER, INC., et al., Defendants.**

**Nos. CIV. 04–1358 WBS GGH, 05–0559 WBS GGH, 05–1726 WBS GGH.**

United States District Court,
E.D. California.

June 29, 2009.

Scottlynn J. Hubbard IV, Lynn Hubbard III, Law Offices of Lynn Hubbard, Chico, CA, James M. Crawford, Jr., Crawford Law Office, P.A., The Woodlands, TX, Daniel E. Wilcoxen, Wilcoxen Callahan Montgomery and Deacon, Russell Glenn Porter, Martin Niels Jensen, Porter Scott, Sacramento, CA, for Plaintiffs.

Michael B. Roche, PHV, L. Andrew Brehm, PHV, Schuyler Roche and Zwirner, James W. Ducayet, PHV, Mike Bartolic, PHV, William F. Conlon, PHV, Sidley Austin LLP, Chicago, IL, James D. Adducci, Marshall L. Blankenship, Adducci Dorf Lehner Mitchell and Blankenship, William A. Gould, Jr., Daniel Lawrence Baxter, Wilke Fleury Hoffelt Gould and Birney, Sacramento, CA, for Defendants.

*MEMORANDUM AND ORDER RE: CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DEFENDANTS' MOTION TO STRIKE CLASS ACTION ALLEGATIONS, AND PLAINTIFFS' MOTION TO REMOVE PLAN TRUSTEES*

WILLIAM B. SHUBB, District Judge.

Plaintiffs James P. DeFazio, Theresa Beetham, Brenda DiMaro, DeLane Humphries, Hallie Lavick, Michael McNair, Sonya Pace, Judy Seay, Nancy Russell Stanton, Cindy Worth, and Kathleen Ellis filed these consolidated actions against defendants Hollister, Inc. ("Hollister"), Hollister Employee Share Ownership Trust ("HolliShare"), The Firm of John Dickinson Schneider, Inc. ("JDS"), Samuel Brilliant, Richard I. Fremgen, Donald K. Groneberg, Charles H. Gunderson, Alan F. Herbert, James A. Karlovsky, Lori Kelleher, James J. McCormack, Charles C. Schellentrager, Loretta L. Stempinski, Michael C. Winn, and Richard T. Zwirner alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1144. Presently before the court are plaintiffs' and defendants' cross-motions for partial summary judgment, defendants' motion to strike class action allegations, and plaintiffs' motion to remove the plan trustees.

I. *Factual and Procedural Background* [1]

In a fourteen-month period between 2004 and 2005, three groups of the current makeup of plaintiffs—former participants and beneficiaries of HolliShare, a defined contribution plan [2] established by Hollister (*see* 1st Zwirner Decl. (Docket No. 399) ¶ 7)—independently filed complaints against defendants Hollister, its parent company JDS, the HolliShare trustees, and various members of the boards of directors of both companies. The cases were consolidated by court order on May 25, 2006. (Docket No. 87.) Currently, the plaintiffs are divided into two groups based upon the two operative complaints in this litigation. Ten of the plaintiffs ("DeFazio/DiMaro plaintiffs") are represented

---

**1.** The following facts are undisputed unless otherwise noted.

**2.** A "defined contribution plan" or "individual account plan" pays the participant the value of his or her retirement account at retirement. *LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 128 S.Ct. 1020, 1022 n. 1, 169 L.Ed.2d 847 (2008). In contrast, a "defined benefit plan," not at issue in this case, pays the participant a fixed level of retirement income. *Id.*

by the same counsel and filed their Fifth Amended Complaint ("HAC") on July 22, 2008. (*See* Docket No. 368.) Ellis, the only plaintiff represented by separate counsel, filed her Fourth Amended Complaint ("FAC") on January 23, 2008.[3] (*See* Docket No. 314.) Though they differ in some respects—most notably, the HAC contains class action allegations while the FAC does not—the allegations asserted against defendants are substantially similar in both the HAC and FAC.

The claims in this case are based upon the alleged misconduct by the fiduciaries of HolliShare. HolliShare is funded through contributions by Hollister from the company's profits; participants are not permitted to make personal contributions. (*See* Defs.' 1st App'x (Docket Nos. 486–488) Ex. 1 ("Trust Instrument") §§ 6.01, 6.02.) Hollister is a privately-held Illinois corporation that manufactures and markets healthcare products. (1st Zwirner Decl. (Docket No. 399) ¶¶ 4, 8.) It is the operating subsidiary of JDS, an Illinois corporation that holds all of Hollister's capital stock.[4] (*Id.* ¶ 5.) Consistent with the terms of the HolliShare Trust Instru-

ment, the plan's principal investment is common shares of JDS.[5] (Trust Instrument § 11.01(1); 2d Zwirner Decl. (Docket No. 494) ¶ 8.)

In their papers on the instant motions, the parties have divided plaintiffs' claims into three rough categories according to the three primary factual bases upon which they are premised: the prohibited transactions between HolliShare and JDS, the 1999 Transaction (a series of events culminating in the transfer of all of the preferred shares of JDS to a new trust), and the DeFazio–Ellis divorce proceedings.[6] Though these categorizations overlap in certain areas, given the complexity of the factual issues in this case, the court will follow the convention adopted by the parties.

## A. Prohibited Transactions

JDS has two classes of shares, preferred and common, neither of which has a generally recognized public market. (2d Zwirner Decl. ¶¶ 10–11.) The JDS Articles of Incorporation ("JDS Articles") provide several restrictions on JDS shares relevant to this case.[7] First, pursuant to article five,

---

**3.** As used in this Order, the term "plaintiffs" refers collectively to all eleven plaintiffs unless otherwise noted.

**4.** The parties have filed numerous purported evidentiary objections to the materials submitted in support of the parties' respective motions. The bulk of these so-called objections do not raise cognizable arguments under the Federal Rules of Evidence, and many consist simply of argument on the merits of the motions. To the extent that the objections concern evidence not relied upon, they are moot. The court will address only those specific objections raising cognizable evidentiary objections to material relied upon in the court's analysis.

Here, plaintiffs do not dispute the facts concerning the structure of Hollister and JDS, but object to this evidence on relevance grounds. (Pls.' Reply to Disputed Material Facts (Docket No. 540) No. 2.) The court

overrules this objection, as these facts are relevant to a background understanding of the relationship between the various entities in this litigation.

**5.** Under the terms of the Trust Instrument, participants' accounts are not valued in numbers of shares of JDS common stock. Instead, HolliShare invests in JDS common stock with contributions from Hollister, and participants' accounts are valued based on their proportional interest in the total value of that trust fund. (Trust Instrument § 7.02(1).)

**6.** In contrast, plaintiffs in their complaints have divided their claims by the specific provisions of ERISA that defendants allegedly breached. Each claim is then premised on multiple factual bases.

**7.** The JDS Articles were amended multiple times between 1978 and 1999. (*See* Defs.' 1st

paragraph II.C ("paragraph II.C"), only certain persons and entities are entitled to own JDS shares, including holders of shares as of May 5, 1978, employees of JDS and/or Hollister, and any deferred benefit plan maintained by JDS and/or Hollister.[8] (Defs.' 1st App'x Ex. 4 ("JDS Articles") 9.)

Second, article five, paragraph II.D ("paragraph II.D") restricts the manner in which holders of JDS stock may transfer ownership. Specifically, paragraph II.D.2 gives JDS a first right of refusal by requiring that any holder of JDS stock who intends to transfer one or more shares to another must first offer to sell those shares to JDS. (JDS Articles 10.) Paragraph II.D.3 further provides that the price paid for any common share purchased by JDS "shall be its book value as of the end of the calendar month in which the Repurchase Date occurs.... The book value of each common share shall be computed in accordance with generally accepted accounting principles ...."[9] (*Id.* 12.) Despite these requirements, paragraph II.D.7 provides that:

> "Under exceptional circumstances and in the discretion of the Corporation's Board of Directors, shares may be repurchased by the Corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the Corporation and the owner

or holder of such shares may from time to time agree."

(JDS Articles 15.)

JDS common shares are HolliShare's primary investment, and HolliShare must sell those shares in order to raise the cash needed to pay benefits to participants and beneficiaries. (3d Zwirner Decl. (Docket No. 515) ¶ 7.) Since the mid–1980s, HolliShare has sold its holdings of JDS common shares to JDS pursuant to the "exceptional circumstances" provision of paragraph II.D.7, not the first right of refusal embodied in paragraph II.D.2. (Pls.' Stmt. of Undisputed Facts Ex. B ("Zwirner Dep.") 237:19–238:8; 3d Zwirner Decl. ¶¶ 9, 16, 18.) Defendants contend that HolliShare and JDS entered into an agreement ("mid–80s buy-back agreement") that has since governed JDS's repurchase of common shares from HolliShare in order to avoid certain complications. (*See* 3d Zwirner Decl. ¶ 16.)

The JDS Articles provide that when JDS repurchases shares pursuant to the first right of refusal, it is obligated to pay a only minimal amount in cash (set originally at $5,000 and then increased to $250,000 in 1999) and can pay the remainder with a promissory note. (JDS Articles 12, 44.) Because HolliShare, as an ERISA plan, is prohibited from accepting a promissory note as payment from an employer, *see* 29 U.S.C. § 1106(a)(1)(B), and HolliShare's cash needs often exceeded the $5,000 and $250,000 minimums, HolliShare could not have sold its shares to JDS

App'x Ex. 4.) Unless otherwise noted, the cited paragraphs of JDS Articles are common to all of the versions.

**8.** Paragraph II.C was amended in 1984 to allow certain directors and officers of JDS and Hollister to own stock and again in 1999 to allow The Firm of John Dickinson Schneider, Inc. Preferred Share Trust April 21, 1999 to hold shares. (JDS Articles 35, 51.)

**9.** As noted in an earlier Order, "book value" refers to a method used to value corporate stock, but the term has no generally accepted definition. *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F.Supp.2d 1085, 1087 n. 2 (E.D.Cal.2005) (Karlton, J.) (citing 51 A.L.R.2d 606 § 2). "[T]he term contemplates a theoretical value resulting from depreciation or appreciation as computed upon an originally determined base." *Id.*

under the terms of that provision. (3d Zwirner Decl. ¶ 15.) If JDS did not waive its right of refusal, HolliShare would thus have been unable to sell its JDS stock to anyone pursuant to paragraph II.D.2. (*Id.*)

To avoid this problem, and to allow JDS to plan ahead for its cash flow needs, HolliShare and JDS agreed in the mid-1980s that: 1) JDS would repurchase HolliShare's common shares entirely for cash (i.e., would not tender promissory notes); 2) the price employed would be the most recent audited December 31 per share book value rather than the month-end book value from the date of the transaction, as provided in paragraph II.D.3; and 3) such transactions would take place only once a year. (3d Zwirner Decl. ¶ 16.)

Plaintiffs contend that these repurchases of JDS common shares from HolliShare using book value violated defendants' statutory duties under ERISA. Particularly in light of evidence that JDS common shares may have had a value in the "outside world" of up to three-times book value (Pls.' Stmt. Disputed Facts Ex. F ("Winn Dep.") 91:15–92:13), plaintiffs assert that defendants breached their fiduciary duties, 29 U.S.C. 1104(a)(1)(B), and violated the provision on prohibited transactions, *id.* § 1106(a)(1)(A).[10]

### B. *1999 Transaction*

HolliShare does not invest in JDS preferred shares. John Schneider, the founder of JDS, owned a majority of the outstanding preferred shares until he placed all of his holdings into a trust in 1977 ("1977 Schneider Trust"). (2d Zwirner Decl. ¶ 24; Defs.' 1st App'x Ex. 3 at 2–3.) Because those shares comprised a controlling interest in JDS, the 1977 Schneider Trust, through its trustees, effectively controlled JDS.[11] (2d Zwirner Decl. ¶ 24.) After 1981, defendants Winn, Stempinski, and Zwirner became trustees of the trust. (*Id.* ¶ 29.)

The terms of the 1977 Schneider Trust provided that it would expire on April 21, 2001. (Defs.' 1st App'x Ex. 3 at 11.) Upon its expiration, the trust called for its corpus of preferred shares to be distributed to employees of Hollister who then owned common shares and agreed to abide by certain principles in governing JDS.[12] (*Id.*) These employee-beneficiaries would have received a number of preferred shares in proportion to their relative holdings of JDS common shares. (*Id.*) Several years before the 1977 Schneider Trust was set to expire, however, its trustees considered the impact of the distribution of preferred shares on the company. (2d Zwirner Decl. ¶ 32.) Defendants contend that the trustees perceived several adverse effects from the distribution, including the possibility that a small number of employees might form an insulated controlling bloc, the prospect that the employees might vote to take JDS public, and the potential that votes to appoint members of the JDS

---

**10.** Though plaintiffs have only moved for partial summary judgment based on the sales of JDS common shares to JDS to raise cash for its obligations, the overall impact of the book value method was broader. The book value method was also used to determine the annual value of both the HolliShare trust as a whole and the proportionate value of each participant's account. (Trust Instrument §§ 7.02, 7.03.)

**11.** Each share of preferred and common stock is entitled to one vote. (2d Zwirner Decl.

¶ 13.) However, since 1977, there have been 61,750,000 outstanding preferred shares compared with only about 400,000 to 3,000,000 common shares. (2d Zwirner Decl. ¶ 14.)

**12.** The listed principles included such policies as pursuing conservative financial and investment strategies, introducing new and improved products, continuing to sell common shares directly to certain employees, and maintaining standards of quality and service. (*See* Defs.' 1st App'x Ex. 3 at 13–17.)

and Hollister boards of directors could lead to factionalism in the company. (*Id.*)[13]

Ultimately, Winn, Stempinski, and Zwirner proposed that a new trust ("1999 Preferred Share Trust") be created to hold the preferred shares that would otherwise be distributed to the employee beneficiaries of the 1977 Schneider Trust. (*See* 2d Zwirner Decl. ¶ 34; Winn Decl. (Docket No. 492) ¶ 28.) On February 17, 1999, they sent a letter ("1999 Proposal Letter") to all employees of Hollister who then owned JDS common shares, stating that the trustees believed that the 1999 Preferred Share Trust was desirable to maintain the independent and employee-owned nature of Hollister and adherence to the principles of John Schneider. (Defs.' 1st App'x Ex. 5 ("1999 Proposal Letter") at 2; 2d Zwirner Decl. ¶ 37.) The letter requested that the recipients transfer the preferred shares to which they would otherwise be entitled to the new trust. (*Id.*) The letter further informed recipients that they would either need to sign an enclosed "Agreement to Vote," which stated that the signatory agreed to adhere to the principles specified by the 1977 Schneider Trust, or the "Consent," which stated that the signatory agreed to transfer the preferred shares he or she would have been entitled to receive to the 1999 Preferred

Share Trust. (1999 Proposal Letter 27; *id.* Enclosures 4, 5.)

On April 21, 1999, all of the recipients of the 1999 Proposal Letter agreed to transfer their prospective preferred shares to the 1999 Preferred Share Trust.[14] (Zwirner Decl. ¶ 43; Winn Decl. ¶ 41.) In order to effect the transfer of shares between the 1977 Schneider Trust and the 1999 Preferred Share Trust at the expiration of the former in 2001, however, the JDS Articles had to be amended to allow the 1999 Preferred Share Trust to own JDS shares. Because the JDS Articles provided that any changes to the stock restrictions required a two-thirds vote of all classes of shares—rather than simply a majority of all outstanding stock (JDS Articles 27)— votes from the shares held by HolliShare (approximately 69% of all common shares) were necessary to effect the amendment. (*See* Thielitz Decl. (Docket No. 493) ¶ 4; 2d Zwirner Decl. ¶ 49.)

At a meeting on April 28, 1999, the HolliShare trustees—who at that time were Zwirner, Karlovsky, and McCormack—agreed to vote HolliShare's JDS common shares in favor of the amendment to the JDS Articles. Ultimately, at the April 30, 1999 JDS shareholders' meeting, JDS shareholders voted unanimously to amend the JDS Articles, and those amend-

---

**13.** Plaintiffs object to this evidence on grounds of lack of personal knowledge, relevance, and hearsay. (Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) No. 64.) The court overrules this objection. Zwirner, who was one of the trustees of the 1977 Schneider Trust, has personal knowledge of the trustees' considerations. This evidence is relevant to defendants' positions concerning the legality of the 1999 Transaction. Finally, there is no hearsay because the evidence does not consist of an out of court statement offered for its truth.

Plaintiffs simply repeat these same objections to all of the evidence concerning the trustees' proposal of the 1999 Trust without

providing any particularized argument for each objection. (*See* Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) Nos. 66, 67, 69.) For the same reasons, the court overrules these objections.

**14.** The record does not indicate the exact number of employees who would have received preferred shares at the expiration of the 1977 Schneider Trust. Nonetheless, the 1999 Proposal Letter indicates that ninety-one employees owned common shares in 1999, and at least eighty-one employees signed the consent form transferring the shares they would have received to the 1999 Preferred Share Trust. (*See* 1999 Proposal Letter 4; Pls.' Stmt. Undisputed Facts Ex. P at 6–11.)

ments were filed with the Illinois secretary of state on June 14, 1999. (2d Zwirner Decl. ¶ 65; JDS Articles 51–52.) The propriety of the vote to approve the amendments, as well as the adequacy of the trustees' decisionmaking process, form the basis of plaintiffs' claims related to the 1999 Transaction. Plaintiffs essentially argue that, but for the 1999 Transaction, HolliShare would have become the majority shareholder of JDS and its holdings would have experienced an increase in value.

For purposes of the instant motions, plaintiffs contend that all of the HolliShare fiduciaries who voted in favor of the 1999 Transaction violated ERISA by engaging in a self-dealing transaction, 29 U.S.C. § 1106(b), and breaching their fiduciary duties, *id.* §§ 1104, 1105.

### C. *DeFazio–Ellis Divorce Proceedings*

Particular to plaintiffs DeFazio and Ellis, the HAC and FAC also assert claims against all defendants based upon Hollister's compliance with a series of domestic relations orders (DROs) issued by the Superior Court of Sacramento as part of DeFazio and Ellis's divorce proceedings. (HAC ¶¶ 132–34; FAC ¶¶ 69–71.)

The marriage of DeFazio and Ellis was dissolved by court order on March 1, 1999.[15] (Defs.' Req. Judicial Notice (Docket No. 530) Ex. A at 14.) In that order, the Superior Court reserved decision for a later date on the division of Ellis's retirement assets and the amount of DeFazio's

share of those assets that would be held as security for the payment of child support. (*Id.* at 6–8.) The issue of the division of Ellis's retirement account with HolliShare was finally determined by a March 29, 2002 stipulation and order ("March 2002 order"). In that order, entitled "Stipulated Qualified Domestic Relations Order," DeFazio and Ellis agreed that DeFazio was entitled to one-half the value of Ellis's HolliShare account as community property, and HolliShare was ordered to hold DeFazio's share in a segregated account. (Req. Judicial Notice Ex. G ("March 2002 order") ¶¶ 4–5.) The order further provided that the Superior Court "retains jurisdiction over Husband's Share in the entire amount up to One Million Five Hundred Thousand and No/100 Dollars ($1,500,-000.00), pending resolution of child support and property settlement issues between Husband and Wife," and ordered HolliShare to retain possession of those funds "pending further order of this court." (*Id.* ¶ 7.) The March 2002 order also stated that "this Order is intended to be a Qualified Domestic Relations Order, as that term is defined in [the Internal Revenue] Code section 414(p) and section 206(d)(3) of the Employee Retirement Income Security Act." (*Id.* 1:26–28.)

Pursuant to the March 2002 order, the Superior Court issued six subsequent orders ordering HolliShare to distribute payments to Ellis that comprised child support payments that DeFazio failed to make and advances on future anticipated child

---

**15.** Defendants have requested that the court take judicial notice of various filings and orders in the DeFazio–Ellis divorce proceedings before the Superior Court of Sacramento. Plaintiffs have not opposed this request. proceeding, the court takes judicial notice of the filings and orders from the Superior Court proceedings. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) ("[W]e may take notice of proceedings in other

courts, both within and without the federal judicial system, if those proceedings have a direct Because the specified documents comprise public records of a related court relation to matters at issue." (internal quotation marks omitted)); *see also Kourtis v. Cameron*, 419 F.3d 989, 994 n. 2 (9th Cir.2005) (taking judicial notice of an unpublished decision from another court), *overruled on other grounds by Taylor v. Sturgell*, —— U.S. ——, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008).

support obligations, as well as associated attorneys fees and costs for the collection of past-due child support payments. (*See id.* Exs. I (order dated August 5, 2002), J (order dated April 2, 2003), K (order dated May 4, 2004), N (order dated June 20, 2004), T (order dated November 9, 2005), U (order dated December 13, 2007).) [16]

Presently before the court are the parties' seven separate motions: 1) defendants' motion to strike plaintiffs' class action allegations (Docket No. 495); 2) defendants' motion for partial summary on claims barred by the statute of limitations (Docket No. 483); 3) defendants' motion for partial summary judgment on the fiduciary status of the Hollister Board and JDS (Docket No. 484); 4) plaintiffs' motion for partial summary judgment on claims related to the prohibited transactions and 1999 Transaction (Docket No. 477); 5) defendants' motion for partial summary judgment on the claims related to the 1999 Transaction (Docket No. 489); 6) DeFazio's motion for partial summary judgment on claims related to the divorce proceedings (Docket No. 474); [17] and 7) plaintiffs' motion to remove the plan trustees (Docket No. 475).

Before turning to the merits of these motions, the court notes that despite the submission of twenty briefs and hundreds of pages of evidence in support of the instant motions, the parties have declined to address numerous claims and have chosen not to discuss specific arguments and factual issues. Plaintiffs in particular expressly chose to withhold certain theories and evidence in their motions. (*See* Dock-

et No. 537 at 20:3–9) ("[P]laintiffs are smarter than that. Our motion for partial summary judgment of the prohibited transaction claims was tailored to narrow questions of law.... We also intentionally avoided disputed factual questions ....."). Even assuming the wisdom of this strategy, the parties have pursued it haphazardly, creating a disjointed record and often confusing each other as to whether certain issues had been raised or whether plaintiffs had abandoned particular claims. The rationale underlying this strategy is not immediately apparent. Nevertheless, the court shall confine its analysis to the particular theories and arguments presented in the parties' moving papers.

## II. *Discussion*

### A. *Motion to Strike Class Allegations*

Defendants move to strike the DeFazio/DiMaro plaintiffs' class allegations, which were first alleged in the Fourth Amended Complaint filed on January 23, 2008. (*See* Docket No. 312 ¶¶ 13–20.) With discovery now closed and the trial date approaching, plaintiffs have not yet moved for class certification, and defendants contend that they have suffered prejudice as a result of the DeFazio/DiMaro plaintiffs' delay in doing so. (*See* Docket No. 495 2:20–26); *Siskind v. Sperry Ret. Program, Unisys,* 47 F.3d 498, 503 (2d Cir.1995) ("[F]undamental fairness requires that a defendant named in a suit be told promptly the number of parties to whom it may ultimately be liable for money damages." (citing *McCarthy v. Kleindienst,* 741 F.2d 1406, 1412 (D.C.Cir.

---

**16.** The Superior Court also issued an order dated December 28, 2002, correcting the March 2002 stipulation's division of Ellis's HolliShare account by reducing DeFazio's community property portion by $53,750. (Req. Judicial Notice Ex. H ¶ 1.)

**17.** Though Ellis also asserts claims based on defendants' compliance with the Superior Court orders, she does not join DeFazio's motion. (*See* Docket No. 476 (joining only plaintiffs' motion for partial summary judgment on claims related to the prohibited transactions and 1999 Transaction).)

1984))); *see also Sterling v. Envtl. Control Bd. of N.Y.*, 793 F.2d 52, 58 (2d Cir.1986) (holding that a plaintiff's "failure to move for class certification until a late date is a valid reason for denial of such a motion").

In response to defendants' motion to strike, the DeFazio/DiMaro plaintiffs submitted a statement of non-opposition. (Docket No. 533.) Having considered defendants' arguments and in light of plaintiffs' non-opposition, the court will grant defendants' motion to strike the DeFazio/DiMaro plaintiffs' class allegations. *See, e.g., Rones v. N.A.A.C.P.*, 170 F.R.D. 80, 82 (D.D.C.1997); *Roberson v. Danny Ontiveros Trucking*, No. 08–552, 2008 WL 4809960, at *6 (E.D.Cal. Nov. 3, 2008) (O'Neill, J.); *Valdez v. St. Francis Mem'l Hosp.*, No. 78–2174, 1979 WL 146, at *1 (N.D.Cal. Jan. 17, 1979); *see also Read v. Input/Output, Inc.*, No. 05–108, 2005 WL 2086179, at *2–3 (S.D.Tex. Aug. 26, 2005). Accordingly, paragraphs twelve through nineteen of the HAC shall be stricken.

### B. *Cross–Motions for Partial Summary Judgment*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 256, 106 S.Ct. 2505. On issues for which the ultimate burden of persuasion at trial lies with the nonmoving party, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact and can sat-

isfy this burden by presenting evidence that negates an essential element of the nonmoving party's case or by demonstrating that the nonmoving party cannot produce evidence to support an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000).

Once the moving party carries its initial burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but must go beyond the pleadings and, "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). On those issues for which it will bear the ultimate burden of persuasion at trial, the nonmoving party "must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103.

In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court also may not engage in credibility determinations or weigh the evidence, for these are jury functions. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

When the parties submit cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir.2003); *see also Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001) (when parties submit cross-motions for summary judgment, "each motion must be

considered on its own merits" and "the court must review the evidence submitted in support of each cross-motion").

### 1. Defendants' Motion on the Statute of Limitations

Defendants move for partial summary judgment on several of plaintiffs' claims as time barred.[18] ERISA's statute of limitations provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

*except that in the case of fraud or concealment,* such action may be commenced not later than six years after the *date of discovery of such breach or violation.*

29 U.S.C. § 1113 (emphasis added).

 Unless the "fraud or concealment" exception applies, a plaintiff must file a claim within six years of the date of the last act constituting a part of the alleged violation, regardless of when the plaintiff actually learned of the violation. *Kanawi v. Bechtel Corp.,* 590 F.Supp.2d 1213, 1225 (N.D.Cal.2008). "The fraud or concealment exception applies only when an ERISA fiduciary either misrepresents the significance of facts the beneficiary is aware of (fraud) or ... hides facts so that the beneficiary never becomes aware of

them (concealment)." *Barker v. Am. Mobil Power Corp.,* 64 F.3d 1397, 1401 (9th Cir.1995) (quoting *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1220 (7th Cir.1990)); *see Ranke v. Sanofi–Synthelabo Inc.,* 436 F.3d 197, 204 (3d Cir. 2006) (stating that an ERISA fiduciary must "have taken affirmative steps to hide an alleged breach of fiduciary duty from a beneficiary in order for the 'fraud or concealment' exception to apply").

Some courts have recognized that the "fraud or concealment" exception to § 1113 incorporates the common law doctrine of "fraudulent concealment." *Barker,* 64 F.3d at 1402. Under that common law doctrine, passive concealment alone may toll the statute of limitations if the defendant has a duty to disclose material information. *Thorman v. Am. Seafoods Co.,* 421 F.3d 1090, 1092 (9th Cir.2005). Courts that have considered the question, however, have rejected the doctrine of passive concealment as applied to § 1113. *See, e.g., Larson v. Northrop Corp.,* 21 F.3d 1164, 1174 (D.C.Cir.1994) ("While a fiduciary's mere silence could, in some circumstances, amount to fraud, it would still fall short of the fraudulent concealment that courts have required for purposes of § 1113."); *Schaefer v. Ark. Med. Soc'y,* 853 F.2d 1487, 1491 (8th Cir.1988) (holding that active concealment under § 1113 requires "more than merely a failure to disclose").

 The Ninth Circuit in *Barker* also implicitly found passive concealment insufficient to toll the six-year statute of limitations. In holding that the defendants in that case did not engage in "fraud or concealment," the *Barker* court focused only on whether the defendants had affirma-

---

**18.** As part of their motion, defendants argue that plaintiffs' claims related to the 1999 Transaction are barred by the statute of limitations. The parties' contentions regarding the 1999 Transaction, including the related amendments to the JDS Articles, are addressed in Section II.B.4, *infra.*

tively concealed their breach, *see* 64 F.3d at 1401, even though the Court of Appeals recognized that an ERISA fiduciary generally has a duty to disclose accurate information to beneficiaries, *see id.* at 1403 (noting the fiduciary's duty "to convey complete and accurate information material to the beneficiary's circumstance"). The "fraud or concealment" exception, therefore, does not apply simply because an ERISA fiduciary fails to disclose material information.[19]

### a. *Amendments to the JDS Articles*

◼ Defendants first move for summary judgement on plaintiffs' claims based upon HolliShare trustees' votes in favor of amending the JDS Articles in 1978, 1980, 1984, and 1999. (Docket No. 483 7:9–16.) According to the complaints, defendants' breached their fiduciary duties by voting for these amendments, which allegedly harmed HolliShare's assets. For example, the 1978 amendments reinstated the stock transfer restrictions on repurchases of JDS common shares. (HAC ¶ 66; FAC ¶ 50.) The 1980 amendment allegedly reduced JDS cash reserves and thus JDS's ability to repurchase HolliShare's holdings, while the 1984 amendment allegedly reduced the reliability of JDS audits. (*See* HAC ¶¶ 67–68; FAC ¶¶ 51–52.) The 1999 amendments—the votes for the last of which were cast on April 30, 1999—indemnified corporate directors from suit by shareholders and prohibited any natural persons from owning more than 10% of JDS stock. (*See* HAC ¶¶ 69–70, 76; FAC ¶¶ 53; Thielitz Decl. ¶ 40.)

The first of the complaints in this consolidated action was filed on July 15, 2004. (Docket No. 1.) However, the first complaints that asserted claims related to these amendments were not filed until April 19 and 20, 2007 (*see* Docket Nos. 182–183), more than six years after the vote for the last amendment at issue. Based on the record before the court, there is no evidence from which a reasonable inference could be drawn that defendants took steps to conceal any of the votes in favor of the amendments. Furthermore, all of the amendments to the JDS Articles were filed with the Illinois Secretary of State. (*See* JDS Articles 6, 32, 40, 42, 49.) Though it does not appear that HolliShare fiduciaries affirmatively disclosed to beneficiaries and participants that they had voted HolliShare's holdings of JDS common shares in favor of these amendments, such passive concealment does not qualify for the "fraud or concealment" exception of § 1113. Accordingly, because there is no dispute that the first complaints to assert claims based on votes in favor of amendments to the JDS Articles were filed after the six-year limitations period expired for the 1978, 1980, 1984, and certain 1999 amendments, defendants are entitled to summary judgment on plaintiffs' claims based upon any fiduciary's affirmative vote in favor of these amendments.

◼ Nonetheless, plaintiffs have also asserted claims pursuant to 29 U.S.C. § 1105(a)(3), which makes a fiduciary liable for the breach of another fiduciary if "he has knowledge of a breach by such

---

19. In their opposition to defendants' motion, plaintiffs request that the court grant summary judgment *sua sponte* in their favor based on the absence of evidence of complete and accurate disclosures by HolliShare fiduciaries. (Docket No. 532 at 7:9–13.) The statute of limitations defense presented in defendants' motion does not involve the duty to disclose. The court will not enter summary judgment in favor of plaintiffs under these circumstances. *See Kassbaum v. Steppenwolf Prods., Inc.,* 236 F.3d 487, 495 (9th Cir.2000) (noting that "great care" must be exercised in granting summary judgment to a non-movant on certain claims to ensure that the movant has had an adequate opportunity to respond).

other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." The failure to remedy such a breach constitutes a separate breach of duty. *See* Dep't of Labor Opinion No. 76–95 (Sept. 30, 1976) (providing that the failure to take action to cure the breaches of another fiduciary despite knowledge constitutes a separate breach of fiduciary responsibility of a successor fiduciary). Pursuant to § 1113(1)(B), the six-year statutory period does not begin to run in the case of a fiduciary omission until the date on which the fiduciary "could have cured the breach or violation."

■ One form of remedying the breaches of a co-fiduciary would be to file a suit against the breaching co-fiduciary to restore the losses to the plan or redress any violations of ERISA. *See Fernandez v. K–M Indus. Holding Co.,* 585 F.Supp.2d 1177, 1185 (N.D.Cal.2008) (holding that the statute of limitations did not begin until the last day defendant could have brought an action against co-fiduciaries for engaging in a prohibited transaction). *See generally Concha v. London,* 62 F.3d 1493, 1500 (9th Cir.1995) (holding that 29 U.S.C. § 1132(a)(2)(3) authorizes suits by fiduciaries against co-fiduciaries seeking relief on behalf of the plan).

Assuming HolliShare fiduciaries had actual knowledge of the votes at the time they were cast and that such votes constituted ERISA violations, they would have had three years to file a suit. 29 U.S.C. § 1113(2). With regard to votes in favor of the 1999 amendments at issue, that three-year period would have expired in April 2002, and there is no evidence indicating that any fiduciary took steps to remedy the breach in question. Since the complaints asserting claims based on these votes were filed on April 19 and 20, 2007,

plaintiffs' § 1105(a)(3) claims related to the votes in favor of the 1999 amendments are not time barred.

As part of their motion for partial summary judgment, defendants have also requested that Gunderson be dismissed as a defendant from this action because no basis for his liability appears in the record. (Docket No. 483 at 7:17–8:3.) In response, plaintiffs have not identified any conduct for which Gunderson could be liable other than a purported failure to challenge the 1978 amendments while he served as a HolliShare trustee in 1979. (Docket No. 532 at 14:27–15:8.) Since claims based on the conduct of fiduciaries associated with the 1978 amendments are time barred, however, the court will grant defendants' request to dismiss Gunderson as a defendant in this action.

### b. *DiMaro, Humphries, and Seay*

■ Defendants also move for summary judgment on the claims asserted by DiMaro, Humphries, and Seay related to HolliShare's use of book value both in the calculation of the balance of individual accounts and in the sales of JDS common shares to JDS (the prohibited transactions). (Docket No. 483 at 8:6–12:11.) They contend that, because these plaintiffs terminated their employment with Hollister more than six years before they filed suit, any claims based on the use of book value that affected these plaintiffs' retirement accounts are time barred.[20] (Docket No. 483 at 11–23.) The record shows that Humphries' employment with Hollister terminated on January 3, 1998; Seay's employment terminated on July 16, 1999; and DiMaro's employment terminated on September 30, 1999. (Thielitz Decl. ¶ 4.)

---

**20.** Defendants do not contend in the instant motion that Humphries, DiMaro, and Seay had actual knowledge of their claims, which

would invoke the shorter three-year limitations period.

The statute of limitations must be applied separately to the claims concerning the valuation of individual accounts and the use of book value in the prohibited transactions, as these claims are based on distinct facts. With regard to the use of book value to determine the value of individual accounts, the Trust Instrument provides that, when participants become "former participants"—such as by terminating their Hollister employment (Trust Instrument § 3.14)—their account balances are determined using the most recent December 31 valuation preceding the employee's termination date. (*Id.* § 7.02(2).) Those calculations are apparently not made until after the annual audit of JDS year-end financial statements is available, usually by late April or May. (3d Zwirner Decl. ¶ 10.) Thus, the last use of the book value method that affects the determination of a terminated employee's account occurs in the middle of the year following the December 31 preceding termination. Consequently, the ERISA violations applicable to the claims at issue occurred, at the latest, by late April or May 1998 for Humphries and late April or May 1999 for DiMaro and Seay.

DiMaro did not file a complaint until August 25, 2005 (Case No. 05–1726, Docket No. 1), and Humphries and Seay did not assert claims in this action until April 19, 2007 (Second Am. Compl. (Docket No. 183))—both more than six years after the last valuations of their respective accounts. Furthermore, the "fraud or concealment" exception does not apply, as plaintiffs have not identified acts by defendants that concealed or misrepresented the fact that HolliShare accounts are valued using book value. Accordingly, defendants have demonstrated an absence of genuine issues of material fact concerning the expiration of the statute of limitations for DiMaro's, Humphries', and Seay's claims related to HolliShare's valuations of their accounts using book value, and defendants are entitled to judgment as a matter of law on those claims.

These plaintiffs have also asserted claims pursuant to § 1105(a) (3) based on the valuations of their accounts. As described earlier, fiduciaries with knowledge of the breaches of a co-fiduciary have three years to bring suit to remedy the breach, and there is no indication in the record that any fiduciary took steps to remedy the breaches in question.

Even assuming that all HolliShare fiduciaries were aware of the valuations at the earliest possible date, the limitations period did not begin to run for the § 1105(a)(3) claims until three years after the last valuation of the accounts—i.e., late April or May 2001 for Humphries and late April or May 2002 for DiMaro and Seay. DiMaro's complaint filed on August 25, 2005, and Seay's complaint filed on April 19, 2007, were thus timely for their § 1105(a)(3) claims. Humphries' complaint, filed on April 19, 2007, may have been filed more than six years after the last date on which a co-fiduciary could have brought suit in late April or May 2001, assuming that all HolliShare fiduciaries had knowledge of the valuation when it was made in 1998. However, in the absence of evidence of the exact date on which Humphries' account was valued in 1998 and the date on which all co-fiduciaries acquired knowledge of that valuation, defendants have not shown that her claims are barred as a matter of law. Accordingly, defendants are not entitled to summary judgment on the § 1105(a)(3) claims asserted by DiMaro, Humphries, and Seay related to the use of book value in calculating the balances of their accounts.

With regard to claims based upon the use of book value in the prohibited transactions, the last violation occurred on the date of HolliShare's annual sale of JDS common shares to JDS preceding the final

valuation of DiMaro's, Humphries', and Seay's accounts, as that is the last sale of plan assets that could have affected the balances of those plaintiffs' accounts. Those sales took place in the middle of the year after the completion of JDS's year-end audit. (3d Zwirner Decl. ¶ 11.) Thus, the last sale that affected Humphries' account took place in mid–1997, and the last transaction that affected DiMaro's and Seay's accounts took place in mid–1998. Because these plaintiffs did not file complaints until more than six years later on August 25, 2005, and April 19, 2007, their claims are time-barred unless acts of "fraud or concealment" tolled the statute of limitations.

█ Plaintiffs seek to toll the statute of limitations by identifying disclosures made to HolliShare participants that appear to misrepresent the circumstances and conditions of sales of JDS common shares by HolliShare to JDS. For example, the HolliShare trustees provide each HolliShare participant with an annual publication entitled "HolliShare Highlights." (*See* 2d Zwirner Decl. ¶ 25; Defs.' 1st App'x Ex. 9.) That publication, at least since 1997, has stated that "[JDS common shares] are subject to severe transfer restrictions which require that the Trust [i.e., HolliShare] first offer them to JDS at their book value. To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with needed cash." (Ellis's App'x (Docket Nos. 513, 517, 519–20) Ex. E at 7 (1997 edition); Pls.' Stmt. Undisputed Facts Ex. C at 1 (1999 edition); Defs.' 1st App'x Ex. 9 at 1 (2005 edition).)

Upon reading these two sentences, a recipient of "HolliShare Highlights" could have reasonably believed that HolliShare sold its holdings of JDS common shares pursuant to the sale price specified in the "transfer restrictions" of the JDS Articles. Under paragraph II.D.3 of the JDS Arti-

cles, those restrictions require the use of month-end book value from the month in which the transaction occurs. The evidence shows, however, that all sales since the mid–1980s have occurred pursuant to the mid–80s buy-back agreement whereby the prior December 31 book value is used. (Zwirner Dep. 237:19–238:8; 3d Zwirner Decl. ¶¶ 9, 16, 18.)

In addition, because this disclosure references the stock restrictions in connection with the sale of JDS common shares, it appears to conceal the fact that HolliShare's sales to JDS occurred pursuant to a negotiated agreement under the "exceptional circumstances" provision of paragraph II.D.7 rather than the absolute right of first refusal contained in paragraph II. D.2. These disclosures could thus be read to misrepresent not only the sale price used in HolliShare's sales of JDS common shares, but also the flexibility and discretion HolliShare fiduciaries may have had in setting the terms of those sales. Making inferences in favor of plaintiffs, such misrepresentations could have reasonably hindered DiMaro, Humphries, and Seay from discovering the alleged breaches of fiduciary duty. *See Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 789 (3d Cir.2001) (finding that a fiduciary's misrepresentations as to the reasons justifying particular transactions could have inhibited the plaintiffs' capacity to discovery the breaches of fiduciary duty).

Defendants have identified another disclosure made to HolliShare participants that appears to disclose the use of the December 31 book value in sales of JDS common shares. (*See* 3d Zwirner Decl. Ex. A at 16.) This other, seemingly conflicting disclosure, however, simply provides additional evidence of a genuine issue of material fact over whether the information provided to HolliShare par-

ticipants affirmatively misrepresented or concealed facts concerning the use of book value in the prohibited transactions.

Despite evidence of "fraud or concealment," the statute of limitations would not be tolled as to claims asserted against defendants who did not actually engage in the acts designed to conceal the alleged fiduciary breaches. *See Barker,* 64 F.3d at 1402 (noting that the "fraud or concealment" exception applies only when "the defendant himself has taken steps to hide his breach"). The evidence does not indicate whether all of the defendants played a role in the production or distribution of the disclosures in question. Nevertheless, in light of evidence that at least some of the defendants, including individuals who served as HolliShare trustees, were responsible for the disclosures in question, the court cannot determine as a matter of law that all of the claims related to the use of book value in the sales of JDS common shares asserted by DiMaro, Humphries, and Seay are time barred.

Finally, assuming defendants did engage in acts of "fraud or concealment," the statute of limitations was tolled only until the point at which plaintiffs could have discovered the breaches or misrepresentations with reasonable diligence. *See Bulger,* 243 F.3d at 788 ("The statute of limitations is tolled until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment." (internal quotation marks omitted)); *Schaefer v. Ark. Med. Soc'y,* 853 F.2d 1487, 1491–92 (8th Cir.1988) (providing that, under the "fraud or concealment" exception to § 1113, the plaintiffs had to show that "despite their exercise of due diligence or care, they were not on notice of [defendant's] breach of duty").

The evidence indicates that the minutes of the annual JDS Board of Directors meetings state that JDS repurchased JDS common shares from HolliShare at Decem-

ber 31 book value based on the recommendation of the HolliShare trustees. (*See, e.g.,* Pls. Stmt. Disputed Facts Ex. A at H02445.) Those Board minutes could have put plaintiffs on notice of the purported concealment of the facts concerning the circumstances of HolliShare's sales of JDS common shares. The record, however, does not indicate whether (or when) plaintiffs or other HolliShare participants had access to these JDS Board minutes. Making inferences in favor of plaintiffs, there thus exists a genuine issue of material fact concerning whether DiMaro, Humphries, and Seay could have discovered the alleged breaches and acts of concealment more than six years before they filed their claims in this action, and defendants are not entitled to summary judgment on these claims.

Defendants are also not entitled to summary judgment on these plaintiffs' § 1105(a)(3) claims related to the use of book value in the prohibited transactions for the same reasons that the § 1105(a)(3) claims related to the valuation of plaintiffs' accounts survive summary judgment.

Accordingly, defendants are entitled to summary judgment only on the non-§ 1105(a)(3) claims asserted by DiMaro, Humphries, and Seay related to the valuation of their accounts using the book value method.

### c. *Ellis*

■ Defendants claim that Ellis had actual knowledge of her claims related to HolliShare's valuation of her account and the use of book value in the sales of JDS common shares more than three years before she filed her complaint on March 22, 2005. (Docket No. 483 at 9:15–18; *see* Case No. 05–559, Docket No. 1.) Actual knowledge of a breach or violation starts the shorter three-year statute of limitations pursuant to 29 U.S.C. § 1113(a)(2). *See Ziegler v. Conn. Gen. Life Ins. Co.,* 916

F.2d 548, 552 (9th Cir.1990). Unlike the "fraud or concealment" exception, under which a plaintiff's constructive knowledge may start the statutory period, *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir.1996), actual knowledge requires that "a plaintiff [ ] know of the essential facts of the transaction or conduct constituting the violation." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir.1992); *see Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1341 (9th Cir.1994) (holding that knowledge of a transaction that was not inherently a breach of fiduciary duty was not the equivalent of actual knowledge of the breach of the duties of care and loyalty).

Whether a plaintiff had actual knowledge more than three years before filing a claim involves a two-step analysis: "first, when did the alleged 'breach or violation' occur; and second, when did [plaintiff] have 'actual knowledge' of the breach or violation?" *Ziegler*, 916 F.2d at 550.

■ With regard to Ellis's claims related to the valuation of her account, the alleged breach or violation occurred in late April or May each year when book value of JDS common shares was used to value her account. As for Ellis's knowledge of that violation, the evidence shows that Ellis was in receipt of several letters beginning in 1997 discussing HolliShare's use of book value to calculate account balances. First, on May 25, 1997, Ellis drafted a letter to the HolliShare plan administrator asking whether book value was "a fair representation of the value of the Company." (Defs.' 2d App'x Ex. 5 at 45.) Though Ellis wrote the letter, DeFazio, her husband at the time, instructed her what to write. (Ellis's App'x Ex. I ("Ellis Dep.") 67:5.) Ellis then received a reply to this letter from Hollister, which stated that "the fair value of HolliShare's investment in JDS Inc. shares is the book value of such shares,"

and that any "hypothesis as to what JDS Inc. might be sold for as an entity is highly speculative and irrelevant given the [Trust Instrument]." (*Id.* Ex. K at 1.)

In addition, on December 24, 1997, Ellis received and read a copy of a September 26, 1997 letter sent by DeFazio to Hollister. (Ellis Dep. 83:14–19.) That letter described DeFazio's concern over the use of the book value method "as the basis for determining account balances," and how "all the tax attorneys and pension consultants [DeFazio] discussed this matter with say that this is definitely an incorrect practice." (Defs.' 2d App'x Ex. 5 at 49.) The letter goes on to say that the "current value should reflect what the stock would sell for." (*Id.*) Finally, in the DeFazio–Ellis divorce proceeding, Ellis filed a declaration on September 20, 2001, in which she indicated that DeFazio had been labeled a "whistle blower" at Hollister with respect to his investigation into the value of Ellis's HolliShare account. (*Id.* at 53.)

The collection of letters from 1997 provides sufficient evidence of Ellis's actual knowledge of her claims related to the use of book value to calculate the balance of her HolliShare account. Even though she testified that she did not understand the distinctions between book value and fair market value at the time she drafted the May 25, 1997 letter (Ellis Dep. 68:1–2), DeFazio's September 26, 1997 letter, which Ellis read, explained DeFazio's opinion that book value is not an appropriate measure of JDS stock. These letters were sufficient to give Ellis awareness that HolliShare used book value to determine the value of her account, that HolliShare relied upon the Trust Instrument and JDS Articles to justify the use of book value, and that there was a question as to whether that method represented the market value of the stock. That knowledge constituted the essential facts underlying her claims

related to HolliShare's valuation of her account.

 Whether Ellis knew or agreed with DeFazio that the facts surrounding HolliShare's use of book value to value her account constituted a violation of ERISA is irrelevant. *See Blanton v. Anzalone,* 760 F.2d 989, 992 (9th Cir.1985) (holding that the ERISA statute of limitations is triggered by "knowledge of the transaction that constituted the alleged violation, not by [ ] knowledge of the law"). Furthermore, even though the final valuation of Ellis's account occurred in 2004, the year of the termination of her employment, the three-year statute of limitations began to run at the latest in 1997, as that was the earliest time she became aware of the breaches in question. *See Phillips v. Alaska Hotel & Rest. Employees Pension Fund,* 944 F.2d 509, 520 (9th Cir.1991) (holding that, pursuant to § 1113(2), the statute of limitations begins to run upon the earliest date that the plaintiff becomes aware of any breach in a series of breaches of the same character). Finally, the plan administrator's denial of wrongdoing does not constitute an act of fraud or concealment. *See Whitlock Corp. v. Deloitte & Touche, L.L.P.,* 233 F.3d 1063, 1066 (7th Cir.2000) ("Simple denials of liability do not toll the period of limitations or estop the adverse party to rely on it.").

Ellis's knowledge in 1997 therefore started the three-year statute of limitations, and her claims filed on March 22, 2005, related to HolliShare's use of book value to calculate the balance of her account and the failure to correct that practice are time-barred.

With regard to Ellis's claims related to the use of book value in the prohibited transactions, the relevant violation occurred each year when HolliShare sold shares to JDS for the allegedly improper sale price. As for Ellis's knowledge, the evidence does not indicate that she had

actual knowledge of the essential facts related to the use of book value in the prohibited transactions more than three years before she filed her complaint on March 22, 2005. None of the correspondence identified by defendants describes the circumstances of the sales of JDS common shares by HolliShare; instead, the letters focus on the use of book value in calculating the balance of individual accounts and the value of HolliShare's holdings generally. (*See, e.g.,* Defs.' 2d App'x Ex. 5 at 50 (describing DeFazio's concern only with "the practice of using the book value of the JDS stock as the current value for that stock in the annual report of the plan, and more important as the basis for determining the account balances and the amount of the distributions to former employees").)

Furthermore, Ellis's declaration submitted in her divorce proceedings references the "valuation of HolliShare" (*id.* at 49) and does not indicate that she was aware of the use of book value in the annual sales of JDS common shares to JDS. The evidence therefore does not show that Ellis had actual knowledge of the essential facts underlying her claims related to the use of book value in the sales of JDS common shares.

Accordingly, defendants are entitled to summary judgment only on Ellis's claims related to HolliShare's use of book value in calculating the balance of her account.

### d. *DeFazio*

Defendants move to dismiss DeFazio's claims based on HolliShare's alleged mishandling of his alternate payee account by not providing the same return as other HolliShare accounts. (Docket No. 483 at 12:20–13:3.) They argue that DeFazio had actual knowledge of his claim in 1997. In his September 26, 1997 letter, DeFazio expressed some concern regarding HolliShare's handling of alternate payee accounts, stating, "I believe the plan auto-

matically invests the account balances of former employees or alternate payees in an investment, similar to a money market account, until those balances are paid out." (Defs.' 2d App'x Ex. 5 at 49.) The letter also expressed that "this is not a correct practice." (*Id.*) In response to an inquiry from DeFazio, Hollister sent a letter on October 18, 2002, stating that his "funds are in a segregated account within HolliShare earning the 90–Commercial Paper Rate as per the *Wall Street Journal.*" (Pls.' Supplemental Stmt. Undisputed Facts (Docket No. 528) Ex. HH at 2.)

DeFazio appeared to recognize as early as 1997 that he would not be receiving the same increase in value on his alternate payee account as did HolliShare participants, and claims based only on that difference are time barred. Nevertheless, his letter does not demonstrate that he had actual knowledge that the plan retained possession of the funds within HolliShare. That distinction is an essential fact to any claim that HolliShare fiduciaries retained the difference in interest between the shares held in DeFazio's alternate payee account and the 90–day commercial paper rate, which DeFazio has identified as his basis for asserting claims based upon the segregation of his alternate payee account. (*See* Docket No. 532 at 11:17–24.) Moreover, the evidence does not indicate that DeFazio became aware of this distinction before he received Hollister's letter on October 18, 2002. Since he filed his first amended complaint containing allegations related to the segregation of his alternate payee account on October 6, 2004, his claims are not time barred. Accordingly, defendants are not entitled to summary judgment on DeFazio's claims.

### 2. *Defendants' Motion on the Fiduciary Status of JDS and the Hollister Board*

Defendants move for summary judgment on all claims asserted against certain individual defendants in their capacities as members of the Hollister Board of Directors on the basis that these defendants properly discharged their duties under ERISA. They also move to dismiss the claims asserted against JDS, contending that the company does not qualify as a de facto ERISA fiduciary. (Docket No. 484 1:19–2:2.)

#### a. *Hollister Board*

■■■■ To qualify as an ERISA fiduciary, an individual or entity may either be named as a fiduciary under the terms of an ERISA plan, *see* 29 U.S.C. § 1102(a), or act as a functional or de facto fiduciary by exercising discretionary control over the management or administration of the plan or its assets, *see* 29 U.S.C. § 1002(21)(A). When an individual or entity is a named fiduciary, that fiduciary's liability may be limited pursuant to provisions of a plan instrument that allocates responsibility among named fiduciaries. *See Walker v. Nat'l City Bank of Minneapolis,* 18 F.3d 630, 633 (8th Cir.1994) ("[U]nless ERISA mandates otherwise, division of authority in the plan determines the duties of the various fiduciaries."); 29 C.F.R. § 2509.75–8(D–4) (noting that a plan instrument may allocate responsibility among named fiduciaries).

Here, the Trust Instrument specifies Hollister, the HolliShare trustees, and the Hollister Board as named fiduciaries. (Trust Instrument § 11.11.) Hollister is responsible for plan administration (*id.*), the trustees are responsible for management of the plan's assets (*id.* §§ 11.01, 11.02), and the Hollister Board has the authority to appoint and remove trustees, (*id.* §§ 11.05–11.07). The Board also has the authority to inspect and audit plan records and receive reports from the plan trustees. (*Id.* § 11.04.) The parties do not dispute that the Hollister Board's potential liability therefore arises from its fiduciary duty to

appoint and monitor the HolliShare trustees. (*See* Docket No. 484 3:24–25; Docket No. 531 20:1–3); *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (per curiam) (holding that an employer who appointed the plan administrator was only a fiduciary and liable as such with respect to the selection of the administrator); *In re Calpine Corp.*, No. 03–1685, 2005 WL 1431506, at *3 (N.D.Cal. Mar. 31, 2005) (noting that the "power of appointment gives rise to a limited duty to monitor").

 Plaintiffs do not dispute that over the years, the Hollister Board appointed competent individuals as trustees, including the General Counsel of JDS and Hollister (Zwirner), Hollister's Chief Financial Officers (Gunderson, McCormack, and Brilliant), and Hollister's heads of human resources (Simon, Schellentrager, Karlovsky, and Kelleher). (2d Zwirner Decl. ¶ 70; Winn Decl. ¶ 57.) The Hollister Board received annual reports from the trustees covering the performance of HolliShare assets, its benefit obligations, and the sales of JDS common shares. (2d Zwirner Decl. ¶ 71; Winn Decl. ¶ 58.) The Board also monitored the returns on HolliShare's investments, including the annual increases in the book value of JDS common shares.[21] (2d Zwirner Decl. ¶ 72; Winn Decl. ¶ 59.)

The adequacy of such monitoring, however, depends largely on the factual circumstances of the plan's investments and the trustees' conduct. *See* 29 C.F.R. § 2509.75–8 (FR–17) ("[T]rustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards ....."). The evidence shows that the vast majority of HolliShare's holdings consisted of JDS common shares (2d Zwirner Decl. ¶ 8), meaning that most of the plan's transactions fell explicitly within the ERISA's prohibited transaction provision. *See* 29 U.S.C. § 1106(a)(1)(A) (prohibiting transactions "between the plan and a party in interest"); *id.* § 1002(14) (defining "party in interest" to include "an employer any of whose employees are covered by such plan"). The HolliShare trustees may therefore have had conflicts of interest in those transactions, especially since at least one trustee—Zwirner—also held positions with JDS and Hollister.

The Hollister Board would have reasonably been aware of these potential conflicts of interest since they flowed directly from the formal positions held by the parties to the transactions. The Hollister Board should have known that ERISA required that the trustees perform a good faith determination of the fair market value of plan assets. In light of these circumstances, a factfinder could reasonably infer that the Hollister Board's limited annual monitoring of HolliShare trustees was insufficient. *See Leigh v. Engle*, 727 F.2d 113, 135–36 (7th Cir.1984) (holding that appointing fiduciaries who were aware of the plan trustees' conflicting loyalties in certain transactions were obliged to take extra measures to monitor the trustees' actions). A genuine issue of material fact thus exists as to the adequacy of the Hollister Board's monitoring of the plan trustees.

### b. *JDS*

The Trust Instrument does not make JDS a named fiduciary. Nevertheless, to

---

**21.** Plaintiffs object to this evidence for lack of foundation and lack of personal knowledge. (Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) No. 128.) The court overrules this objection. Winn and Zwirner, who have both served as Hollister Board members, have sufficient personal knowledge to give evidence as to the Board's monitoring of the annual change in book value.

the extent that JDS exercised discretionary control or authority over the management of HolliShare's assets, it can be considered a de facto, or functional, fiduciary of the plan. *See Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (citing 29 U.S.C. § 1002(21)(A)); *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir.1998) ("The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets . . . .").

Here, though JDS did not actually manage HolliShare's assets, the evidence indicates that JDS exercised discretion over HolliShare's sales of its primary asset— JDS common shares. It is undisputed that, as a result of the JDS stock ownership and transfer restrictions, no generally recognized market exists for HolliShare's holdings of JDS common shares. (*See* 1st Zwirner Decl. ¶ 10; Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) No. 5.) Zwirner stated in his declaration that, given the number of shares that HolliShare must sell each year to meet its cash needs, HolliShare might not be able to sell its holdings for even book value without JDS's commitment to purchase its shares.[22] (1st Zwirner Decl. ¶ 50.)

██ This evidence alone is sufficient to create a genuine issue of material fact as to JDS's discretionary control over HolliShare's holdings of JDS common shares. If, for example, HolliShare had a particularly strong need for cash in a particularly lean year for JDS, JDS could choose not to repurchase HolliShare's shares or to repurchase fewer than all of the shares HolliShare sought to sell. According to Zwir-

ner, HolliShare would thereafter be forced to sell its holdings for a lower price. JDS has, of course, agreed to repurchase HolliShare's holdings pursuant to the mid–80s buy-back agreement and currently through three-year commitments. (*See id.* ¶ 49). Defendants contend that under those arrangements, HolliShare trustees determine the number of shares that JDS will repurchase in a given transaction. (2d Zwirner Decl. ¶ 77.) Nevertheless, no evidence suggests that those commitments are legally binding on JDS, and a reasonable factfinder could infer that HolliShare would have no recourse if JDS decided to stop or reduce its repurchases.

Accordingly, because there exist genuine issues of material fact regarding the fiduciary status of the Hollister Board and JDS, defendants are not entitled to partial summary judgment in their favor, and the court must deny their motion.

### 3. *Prohibited Transactions*

Plaintiffs move for partial summary judgment on their claims arising out of the annual sales of JDS common shares by HolliShare to JDS. Specifically, plaintiffs argue that HolliShare's sales of JDS common shares to JDS for per-share book value breached ERISA's fiduciary duty of prudence and violated the prohibition on certain types of transactions. (Docket No. 479 at 6:10–8:26); *see* 29 U.S.C. §§ 1104(a)(1)(B), 1106(a)(1)(A).

#### a. *Good Faith Determination*

ERISA establishes a blanket prohibition on certain transactions, including the sale or exchange of property between an ERISA plan and a "party in interest," because such transactions "entail a high potential for abuse." *Donovan v. Cun-*

---

**22.** Plaintiffs object to this evidence for lack of personal knowledge. The objection is overruled. Zwirner, who serves not only as a HolliShare trustee but also as a JDS Board member (1st Zwirner Decl. ¶¶ 6–7), has sufficient personal knowledge of the market for JDS common shares and HolliShare cash needs to testify thereto.

*ningham,* 716 F.2d 1455, 1465 (5th Cir. 1983) (discussing 29 U.S.C. § 1106(a)(1)). As used in this section, a "party in interest" includes the employer of the employees covered by the ERISA plan in question. 29 U.S.C. § 1002(14). Nevertheless, ERISA provides an exemption for transactions that meet certain requirements. Section 1108(e) provides an exemption for the sale or acquisition by a plan of employer stock if the sale price is for "adequate consideration." When a security has no generally recognized market, the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." *Id.* § 1002(18); *see also* 29 C.F.R. § 2550.408e (cross-referencing 29 U.S.C. § 1002(18) in defining "adequate consideration" for purposes of § 1108(e)).

■ In addition to prohibiting certain transactions with plan assets, ERISA also imposes a general duty on fiduciaries to act for the exclusive benefit of plan beneficiaries "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Thus, when an ERISA plan transacts in employer securities, its fiduciaries bear the burden of showing that the transaction satisfies the requirements of both §§ 1104(a)(1)(B) and 1108(e). *See Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir.1996).

■ Whether a particular transaction with an interested party complies with both §§ 1104(a)(1)(B) and 1108(e) depends upon the conduct of the fiduciaries.[23] *See Howard,* 100 F.3d at 1488 (citing *Donovan v. Cunningham,* 716 F.2d 1455, 1467–68 (5th Cir.1983)). Fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options." *Id.* at 1488–89; *see Cosgrove v. Circle K Corp.,* 915 F.Supp. 1050, 1064 (D.Ariz.1995) ("Good faith requires that the trustees of the Plan have used a prudent method of determining value."), *aff'd,* 107 F.3d 877 (9th Cir.1997). Nevertheless, the precise scope and nature of the required investigation depends upon the circumstances surrounding the transaction and the asset. *See Keach v. U.S. Trust Co.,* 419 F.3d 626, 637 (7th Cir.2005) (evaluating the sufficiency of the fiduciary's investigation "within the context of the totality of the circumstances"); *Cunningham,* 716 F.2d at 1467–68 (noting that fiduciaries may satisfy their burden by showing they determined fair market value based upon "a prudent investigation in the circumstances then prevailing"); *see also Henry v. Champlain Enters., Inc.,* 445 F.3d 610, 619 (2d Cir.2006) ("Whether a fiduciary has made a proper determination of fair market value depends on whether the parties are well-informed about the asset and the market for that asset." (internal quotation marks omitted)).

■ Here, plaintiffs contend that HolliShare fiduciaries inadequately investigated whether JDS common shares could be sold at a sale price above the December 31 book value employed under the mid–80s buy-back agreement given their awareness of higher estimates of the value of JDS common shares. (Docket No. 479 at 3:8–10.) For example, plaintiffs direct the

---

23. In addition to the thoroughness of investigation, the assessment of the transaction ordinarily includes consideration of "the merits of the transaction." *Howard,* 100 F.3d at 1488. Plaintiffs, however, have moved only on the basis that the HolliShare fiduciaries did not engage in an adequate investigation, not that they did not receive sufficient value in exchange for the JDS shares. (*See* Docket No. 479 at 7:23–25; Docket No. 537 at 20:9–12.)

court's attention to a 1997 memorandum in which Zwirner stated that he discussed with McCormack, another HolliShare trustee (*see* Defs.' 2d App'x Ex. 9 at 17:24–18:24), an "analysis" performed by First Union that estimated the value of JDS to be 3.34 times the book value. (Pls. Stmt. Undisputed Facts Ex. H at 1.) Additionally, Winn, who served on the Hollister Board of Directors until 2001 (Winn Decl. ¶ 2), testified that he knew that JDS common shares had a value in the "outside world" of up to three-times book value. (Winn Dep. 91:15–92:13.) Though the record does not contain a description of the bases for these higher estimates of the value of JDS common shares or whether they included consideration of the applicable stock restrictions, this evidence suggests that multiple defendants had knowledge that JDS common shares could have a value higher than book value.

Defendants respond that the existence of such estimates does not render their determination of the fair market value inadequate in light of the stock ownership and transfer restrictions applicable to JDS common shares. (Docket No. 511 at 5:20–24.) It is undisputed that these restrictions limited the market for JDS common shares. (*See* 1st Zwirner Decl. ¶ 10; Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) No. 5.) The restricted nature of JDS common shares thus provides part of the relevant context for the investigation into the fair market value of that asset. *See Krueger Int'l, Inc. v. Blank*, 225 F.3d 806, 812 (7th Cir.2000) ("Before the accounting rules of an ERISA plan can be applied, the basic terms of the asset to be accounted for must be determined. That is what the [shareholder agreement] does—it defines the bundle of rights to which a[ ] shareholder (whether a direct shareholder or a shareholder through an ERISA plan) is entitled."); *see also Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 370–71, 374 (D.C.Cir.1989) (up-

holding a plan's valuation of closely-held stock based upon the valuation method specified in the corporation's certificate of incorporation).

The parties also do not dispute that the HolliShare trustees were well-informed regarding the restrictions applicable to JDS common shares held by HolliShare as a consequence of their roles in Hollister and JDS. (Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) No. 40.) The three trustee positions have been filled by the Hollister General Counsel, Chief Financial Officer, and head of human resources. (1st Zwirner Decl. ¶ 28.) Plaintiffs do not dispute that the trustees were also aware of JDS's historical practice of redeeming common shares offered to it pursuant to the right of first refusal. (1st Zwirner Decl. ¶ 22; Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) Nos. 17, 40.)

Zwirner stated in his declaration that the HolliShare trustees consciously considered these factors whenever they decided the amount of shares to sell to JDS and the price they would receive pursuant to the mid–80s buy-back agreement. (1st Zwirner Decl. ¶¶ 41–42.) Furthermore, Zwirner testified that he determined the fair market value for any particular sale of shares to JDS by taking into account "the totality of the circumstances" then prevailing. (Zwirner Dep. 21:23–22:9.) Even though conditions changed from year to year, he testified that no such changes "led [him] to reconsider the agreement in practice." (*Id.* at 22:10–14.)

This evidence of the HolliShare trustees' general consideration of the market for JDS common shares in light of the applicable stock restrictions is sufficient to create a genuine issue of material fact regarding the adequacy of the investigation into the possibility of selling JDS common shares at prices higher than book value. Plain-

tiffs are therefore not entitled to summary judgment in their favor on the claims related to the prohibited transactions.

In addition to their arguments that defendants failed to conduct an adequate investigation, plaintiffs also argue that, because ERISA's exemption to 29 U.S.C. § 1106(a)(1)(B) requires that the value of the asset be determined "by the trustee or named fiduciary," 29 U.S.C. § 1002(18), the sales of common shares to JDS constituted *per se* violations of § 1106(a)(1)(B) because book value was determined solely by JDS, which is neither a trustee or named fiduciary. (Docket No. 479 at 7:10–22.) As discussed, however, the record suggests that the HolliShare fiduciaries performed an investigation to determine whether the repurchase price of JDS common shares represented the fair market value for JDS common shares.[24]

Plaintiffs' argument further fails to recognize that book value is simply a particular method of calculating the value of corporate stock. The JDS articles do not empower JDS management to simply determine the repurchase price of its shares; rather, the JDS articles, at least since 1978, establish book value as the method of valuation for the repurchase of JDS shares. (JDS Articles 12.) Though the parties have not submitted evidence of the precise formula underlying that method,

they do not dispute that the book value was computed from audited JDS financial statements. (Pls.' Resp. Defs.' Stmt. Undisputed Facts (Docket No. 540) No. 53.) The increase in book value from year-to-year is also apparently driven by the profitability of Hollister. (1st Zwirner Decl. ¶ 36.) There is no evidence suggesting that the book value employed for any particular transaction was simply a figure chosen by JDS—rather than the valuation method called for in the JDS Articles—and thus plaintiffs' argument that JDS determined the repurchase price is unsupported by the record.[25]

b. *ERISA Preemption*

Plaintiffs contend that, because specific provisions of the JDS Articles and the mid–80s buy-back agreement set the repurchase price of JDS common shares at book value, the provisions prevent HolliShare trustees from performing their duties under the statute and are therefore preempted by ERISA. (Docket No. 479 at 14:18–15:11.) Plaintiffs request that the court order these provisions stricken "*in their entirety*[ ] so that plan fiduciaries can fulfill their duties under ERISA." (*Id.* at 15:10.)

ERISA provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

**24.** Focusing on defendants' response to certain interrogatories, plaintiffs contend that defendants believed they lacked the power to "assign a value" to JDS common stock. (Docket No. 479 8:18–22 (citing Docket No. 375).) This evidence is at best ambiguous, since in the context of the interrogatories, it is not clear whether defendants' answers address the ability to perform an investigation into the price or the ability to set the price of JDS common stock. Furthermore, given the evidence of the HolliShare trustees' consideration of the market for the asset, the interrogatory responses at best create a genuine issue of material fact concerning the adequacy of investigation.

**25.** Plaintiffs' additional argument that HolliShare trustees may not rely on section 7.03 of the Trust Instrument, which provides that the assets of HolliShare "shall be valued … at their respective fair market values as of each December 31st," to excuse their statutory duty of a good faith determination is moot because defendants do not rely on that provision to justify a complete absence of investigation into the transactions with JDS. Rather, evidence suggests that the December 31st valuation date influenced the timing of sales to JDS. (3d Zwirner Decl. ¶ 10.)

Though ERISA's "pre-emption clause is conspicuous for its breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990), its applicability is plainly limited by its terms to "State laws," defined as "decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c); *see Associated Gen. Contractors of Am. v. Metro. Water Dist. of So. Cal.*, 159 F.3d 1178, 1182 (9th Cir.1998) (" 'ERISA [ ] does not preempt state action which relates to an ERISA plan so long as the state action does not have the effect of law.' ") (quoting *Minn. Chapter of Associated Builders & Contractors, Inc. v. County of St. Louis*, 825 F.Supp. 238, 243 (D.Minn.1993)); *see also id.* at 1184 (holding that ERISA did not preempt a state entity's contracts requiring vendors to participate in employee benefit funds because the contracts did not qualify as "State laws" under 29 U.S.C. § 1144(c)).

■ Here, plaintiffs have failed to identify any "decisions, rules, regulations" or other state action having the effect of law that requires or condones the JDS stock restrictions or the mid–80s buy-back agreement as applied to JDS shares held by HolliShare. Instead, plaintiffs argue that the JDS Articles and the mid–80s buy-back agreement—agreements and arrangements created by private parties— qualify as state laws for the purposes of ERISA preemption because they are purportedly enforceable under Illinois law. (Docket No. 479 at 14:18–21.) The Ninth Circuit, however, has expressly rejected the argument that an instrument's enforceability under the authority of a state confers upon that instrument the status of "State laws" under § 1144(c). *See Associated Gen. Contractors of Am.*, 159 F.3d at 1183 n. 2 ("We see no merit in [plaintiff's]

argument that simply because a contract is legal and enforceable it has the effect of law of a state.").

Because neither the JDS stock restrictions nor the mid–80s buy-back agreement qualify as "State laws" pursuant to § 1144(c), they are not preempted by ERISA. *Cf. Krueger Int'l, Inc. v. Blank*, 225 F.3d 806, 813 (7th Cir.2000) (holding that ERISA did not preempt a shareholder agreement providing the corporation with a repurchase option because ERISA does not preempt state law except where "ERISA and the state law conflict regarding the distribution of an already defined sum").

Alternatively, plaintiffs contend that if ERISA does not preempt the JDS stock restrictions, HolliShare fiduciaries breached their duty of prudence by failing to diversify the plan's investments rather than continuing to hold an asset with such limited marketability. (Docket No. 537 at 15:24–17:6); *see In re Syncor ERISA Litig.*, 516 F.3d 1095, 1102 (9th Cir.2008) (noting that, even though the employee stock ownership plan at issue was designed to invest primarily in employer stock, plan fiduciaries may have breached the prudent man standard of care by investing in that stock when they knew it had an artificially inflated price). However, because plaintiffs raised this argument for the first time in their reply brief, defendants did not have an opportunity to respond or submit evidence on these points. The court will therefore not consider the merits of this argument for the purposes of the instant motion. *See Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F.Supp.2d 1078, 1089 (E.D.Cal.2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief.") (Ishii, J.).[26]

---

**26.** Along similar lines, the court will not consider plaintiffs' argument, raised in their reply brief, that 29 U.S.C. § 1110(a) renders the mid–80s buy-back agreement void as against public policy. (Docket No. 537 at 9:4–11:16.)

Accordingly, the court will deny plaintiffs' motion for partial summary judgment on the claims related to the prohibited transactions.

#### 4. *1999 Transaction*

Both plaintiffs and defendants have moved for partial summary judgment on the claims related to the 1999 Transaction. Defendants first argue that plaintiffs lack constitutional standing to assert their claims. To satisfy "the irreducible constitutional minimum of standing," a plaintiff must establish three elements: (1) the plaintiff "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the existence of a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). "The burden of establishing Article III standing remains at all times with the party invoking federal jurisdiction." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 655 (9th Cir.2002) (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

■ Defendants chiefly contend that plaintiffs claims fail to satisfy the element of redressability.[27] Redressability requires that plaintiffs show that they "would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (footnote omitted); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). Essentially, the redressability prong requires that plaintiffs have a stake in the recovery. *See Paulsen v. CNF Inc.*, 559 F.3d 1061, 1073 (9th Cir.2009). When a plaintiff seeks prospective relief, redressability requires "that prospective relief will remove the harm." *Warth*, 422 U.S. at 505, 95 S.Ct. 2197.

■ Plaintiffs seek two forms of relief from this court with respect to the 1999 Transaction. First, pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2), which together provide that plan fiduciaries may be held personally liable to make good the losses to a plan resulting from the breach of their duties, plaintiffs seek make-whole monetary relief in the form of a revaluation of their accounts as if the 1999 Transaction had not occurred.[28] (Docket No. 531 at 6:19–21; HAC 66:7–9; FAC 41:7–9.) Second, pursuant to § 1132(a)(3), plaintiffs seek equitable relief for their claims based upon the 1999 Transaction in the form of a

---

**27.** Defendants also argue in passing that plaintiffs have not suffered an injury in fact, but it is well-established that statutory violations qualify as an injury in fact so long as the statute in question "creates correlative procedural rights in a given plaintiff." *Fernandez v. Brock*, 840 F.2d 622, 630 (9th Cir.1988). Here, plaintiffs assert that defendants violated 29 U.S.C. §§ 1104 and 1106; ERISA grants participants and beneficiaries a cause of action to prosecute violations of these provisions even before a plan incurs losses. *See Ziegler v. Conn. Gen. Life. Ins. Co.*, 916 F.2d 548, 551 (9th Cir.1990); *M & R Inv. Co. v.*

*Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982).

**28.** Under 29 U.S.C. § 1132(a)(2), the Secretary of Labor, a participant, a beneficiary, or a fiduciary may bring an action for relief under 29 U.S.C. § 1109. Section 1109 in turn provides that plan fiduciaries may be held personally liable "to make good to [the] plan any losses to the plan resulting from such breach [of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter]."

redistribution or cancellation of the JDS preferred shares.[29] (Docket No. 531 at 7:21–24; HAC 65:20–22; FAC 40:20–21.)

Turning first to plaintiffs' request for monetary relief, in the ordinary case, losses to an ERISA plan are measured by the difference between what beneficiaries received and what they would have received absent the plan fiduciary's breaches. This lost value may be ascertained "through expert testimony or other evidence regarding investment returns during the relevant period." *Vaughn v. Bay Envtl. Mgmt., Inc.,* 567 F.3d 1021, 1027 (9th Cir.2009).

Here, plaintiffs' theory as to how the alleged breaches associated with the 1999 Transaction would have affected the monetary value of their HolliShare accounts is premised on the assumption that, if the 1999 Transaction had not been consummated, HolliShare would have ultimately achieved a controlling position in JDS as the company eventually repurchased and cancelled the preferred shares issued to the employee beneficiaries of the 1977 Schneider Trust.[30] (Docket No. 479 at 3:24–26; Docket No. 531 at 14:18–27; HAC ¶¶ 43–46; FAC ¶¶ 25–27.) HolliShare's holdings of JDS common shares

would thereafter allegedly increase in value due to a control premium, which HolliShare would realize in a sale of its holdings after it voted to remove the stock ownership and transfer restrictions contained in the JDS articles. (*See* Docket No. 531 at 6:21–23, 14:23–27; Docket No. 479 at 4:4–8.)

The evidence indicates, however, that it is far from certain that HolliShare would have eventually controlled a majority of JDS voting shares and obtained the theoretical increase in monetary value therefrom. At the time of the creation of the 1999 Transaction and in 2001 (the year in which the 1977 Schneider Trust would have expired), the 1977 Schneider Trust held 61,750,000 JDS preferred shares—constituting 97 to 98% of all JDS outstanding shares between 1999 and 2001—compared to HolliShare's holdings of between 758,027 and 1,128,027 JDS common shares. (2d Zwirner Decl. ¶ 14; Thielitz Decl. ¶ 4.) As of the distribution of preferred shares to the eligible employee beneficiaries in 2001, therefore, HolliShare's holdings would have represented a very small percentage of all outstanding voting shares.[31] The holdings of preferred shares would of course have decreased as employee benefi-

---

**29.** Pursuant to 29 U.S.C. § 1132(a)(3), an ERISA plaintiff may bring an action "(A) to enjoin any act or practice which violates the provisions of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." This provision authorizes the grant of equitable relief such as injunction, mandamus, and restitution, but not compensatory damages. *See McLeod v. Or. Lithoprint Inc.,* 102 F.3d 376, 378 (9th Cir.1996).

**30.** Pursuant to paragraph II.D, the employee beneficiaries of the 1977 Schneider Trust would have been required to offer their holdings of preferred shares to JDS when they retired or their employment was otherwise terminated. (JDS Articles 20.) JDS, in turn, would have been required to cancel those shares upon repurchase under article five, paragraph II.G. (*Id.* at 27.)

**31.** Plaintiffs dispute these figures, claiming that HolliShare and another trust (for foreign-based employees) could also have received shares from the 1977 Schneider Trust. (Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) No. 103.) In support of this contention, plaintiffs cite two documents, the "Arnold & Porter opinion" and a page of discovery numbered RZ 1908, without identifying where in the record either document is located. After reviewing the materials submitted in connection with the parties' cross-motions, the court is unable to locate either document and will therefore not consider plaintiffs' contentions based upon them. *See Hoffman v. Constr. Protective Servs., Inc.,* No. 03–1006, 2006 WL 6105639, at *6 (C.D.Cal. Aug. 25, 2006) ("While there may be evidence in the record to support such a finding, '[j]udges are not like pigs, hunting for truffles buried in [the record].'" (quoting *Entm't Research Group,*

ciaries of the 1977 Schneider Trust terminated their employment over time, but the evidence shows that the complete repurchase of preferred shares would have taken years. For example, as of December 31, 2008, almost a decade after the 1999 Transaction, at least fifty of the employee-beneficiaries who would have been entitled to receive preferred shares from the 1977 Schneider Trust were still employed with Hollister. (Thielitz Decl. ¶ 13.) [32]

The date on which HolliShare could have become the majority holder of all outstanding shares could have also been affected by factors other than the gradual repurchase of preferred shares. HolliShare's voting power may not have proportionately increased as the number of preferred shares decreased, as the evidence indicates that the number of JDS common shares held by HolliShare has steadily decreased since 1999. (*See id.* ¶ 4 (stating that HolliShare

holdings have decreased from 1,128,027 shares in 1999 to 458,027 shares in 2008).) In addition, pursuant to article five of the JDS Articles, which authorizes the company to issue up to 71,260,000 shares of preferred stock (JDS Articles 2), JDS could also have issued an additional 9,510,-000 shares of preferred stock, thereby diluting HolliShare's voting power. [33]

Making all inferences in favor of plaintiff, this evidence shows that although the exact date on which HolliShare would become the majority holder of all outstanding JDS shares is uncertain, it is possible that HolliShare would indeed have eventually become the majority holder. Nevertheless, plaintiffs have not identified evidence from which a reasonable inference could be drawn that HolliShare would have experienced any change in value during the period that any plaintiff had an account with HolliShare. [34] To enjoy the increase in val-

---

*Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir.1997))).

Furthermore, plaintiffs' argument that HolliShare could have received preferred shares is not supported by the text of the 1977 Schneider Trust, which provides that the corpus of the trust shall be distributed to "such persons as (1) are then *living*, (2) are then employees of Hollister ... and (4) agree in writing to abide by [certain policies and principles]." (Defs.' App'x Ex. 3 at 11 (emphasis added).)

**32.** Plaintiff objects to this evidence based on Federal Rule of Evidence 602 (personal knowledge). (Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) No. 104.) The court overrules this objection. Dian Thielitz, who currently serves as the Assistant Secretary of Hollister and the corporate Secretary of JDS (Thielitz Decl. ¶ 2), has sufficient personal knowledge of Hollister employee records to testify as to the number of employees who were employed with Hollister as of December 31, 2008, and who would have met the share ownership requirements to be employee beneficiaries of the 1977 Schneider Trust at its expiration in 2001.

**33.** The holders of the preferred shares could also have amended article five, paragraph I to change the number of preferred shares and common shares that JDS was authorized to issue. (JDS Articles 19; *see also id.* at 27 (providing that only the ownership and transfer restrictions required a two-thirds vote for each class of shares).)

**34.** The plaintiffs who were employees of Hollister terminated their employment on the following dates: Humphries (January 3, 1998), Seay (July 16, 1999), DiMaro (September 30, 1999), Lavick (January 7, 2000), McNair (November 17, 2001), Stanton (March 1, 2002), Pace (May 2, 2003), Ellis (June 1, 2004), Wirth (March 31, 2006), Beetham (May 19, 2006). (Thielitz Decl. ¶ 4.) All of these plaintiffs thereafter received a distribution of their vested HolliShare account balance. (*See* Defs.' 2d App'x (Docket Nos. 490–491) Ex. 1 at 69; *id.* Ex. 4 at 46; *id.* Ex. 5 at 43; *id.* Ex. 6 at 42–44; *id.* Ex. 8 at 41; *id.* Ex. 10 at 35; *id.* Ex. 11 at 86; *id.* Ex. 12 at 10; *id.* Ex. 13 at 20; *id.* Ex. 14 at 42.)

DeFazio is the only plaintiff who was not a Hollister employee; he was an alternate payee for the account of Ellis, his ex-wife. In its April 23, 2008 order, the Sacramento Superi-

ue associated with a control premium, the stock ownership and transfer restrictions contained in the JDS Articles would have had to be amended. To do so under the JDS Articles requires a two-thirds vote of every class of shares, including the preferred shares. (*See* JDS Articles 27.)

As of December 31, 2008, approximately five months before HolliShare distributed the balance of the last of the plaintiffs' accounts, at least fifty employee beneficiaries who would have been entitled to receive preferred shares from the 1977 Schneider Trust were still employed with Hollister. So long as any of these employee-beneficiaries still owned any preferred shares, HolliShare would have been unable to change the stock ownership and transfer restrictions contained in the JDS Articles without their support. Therefore, even though as former participants, plaintiffs could have statutory standing to pursue their claims, *see LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 128 S.Ct. 1020, 1026 n. 6, 169 L.Ed.2d 847 (2008), such an attenuated theory underlying a request for plan fiduciaries to restore losses to the plan simply does not satisfy the redressability requirement of constitutional standing.

For example, in *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir.2006), the Ninth Circuit held that medical benefits plan participants could not satisfy the redressability requirement in a suit for monetary relief pursuant to §§ 1109 and 1132(a) because whether the plaintiffs would have enjoyed reduced plan costs in the absence of the alleged fiduciary breaches depended on the conduct of a third party who exercised independent discretion. *See also Paulsen v. CNF Inc.*, 559 F.3d 1061, 1073–74 (9th Cir.2009) (holding that pension plan participants' make-whole claims did not support redressability when their theory of recovery was premised on the Pension Benefit Guaranty Corporation increasing benefits when it was not legally compelled to do so). Similarly, under plaintiffs' theory of monetary relief, whether HolliShare would have realized a control premium while plaintiffs still had HolliShare accounts depends entirely on the assumption that holders of two-thirds of the preferred shares would have voted to remove the JDS stock restrictions.[35]

---

or Court presiding over the DeFazio–Ellis divorce proceedings ordered HolliShare to distribute the balance of DeFazio's alternate payee account to DeFazio. (Req. Judicial Notice Ex. W at 4.) At oral argument, the parties confirmed that HolliShare distributed the balance of DeFazio's account on May 15, 2009.

**35.** In their opposition papers, plaintiffs urge the court to explore a new, heretofore unmentioned theory by which HolliShare could have become the majority holder of all outstanding JDS stock. They highlight that, at the time paragraph II.C of the JDS Articles was amended in 1999 to allow the 1999 Preferred Share Trust to hold JDS shares, the same set of amendments eliminated article five, paragraph II.E, which allowed the 1977 Schneider Trust to hold JDS shares. (*Compare* JDS Articles 27, *with id.* at 52.) Plaintiffs argue that the 1977 Schneider Trust was therefore an unauthorized holder of JDS shares between June 14, 1999 and its expiration on April 21, 2001, and the HolliShare trustees could have brought an action to strip it of its shares.

Similar to plaintiffs' original theory, this new theory is built upon multiple assumptions about the conduct of outside parties. It presumes that such a suit against the 1977 Schneider Trust would have been successful despite the fact that participants in the 1999 Transaction envisioned that the 1977 Schneider Trust would continue to hold its shares until its expiration on April 21, 2001, at which point the shares would be transferred to the 1999 Preferred Share Trust. It also assumes that the court hearing the suit would have ordered any repossessed shares cancelled or not otherwise issued to other authorized holders. Finally, plaintiffs' new hypothetical assumes that the 1977 Schneider Trust would not have filed a reasonable counterclaim against the person or entity bringing such action to have the JDS Articles corrected

As plaintiffs recognize, it is of course impossible to prove exactly what would have happened if HolliShare fiduciaries had not approved the 1999 Transaction. (*See* Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) Nos. 102, 104–06.) Nonetheless, the breach alleged here—the disloyal and imprudent vote of the JDS common shares held by HolliShare—does not inherently support a claim for losses to plaintiffs' retirement accounts.[36] Instead, plaintiffs' theory relies on conjecture regarding what independent third parties might have done—perhaps employee beneficiaries of the 1977 Schneider Trust would have, for some reason, declined to receive their preferred shares, or perhaps HolliShare trustees could have convinced enough preferred share holders to vote for changes to the JDS articles. In light of these ambiguities, plaintiffs, who bear the burden of showing constitutional standing, have "not demonstrated that it is 'likely,' and not merely 'speculative,' that their injury will be redressed by a favorable decision" from this court. *Paulsen*, 559 F.3d at 1074.

With regard to plaintiffs' request for equitable relief, defendants contend that the termination of all of the plaintiffs' HolliShare accounts since the filing of this action has rendered their requests for equitable relief moot. "While standing is determined on the facts as they existed at the time the complaint was filed, a case becomes moot—and, hence, non-justiciable—if the requisite personal interest captured by the standing doctrine ceases to

exist as any point during the litigation." *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 425 (9th Cir.2008) (citations and internal quotation marks omitted); *see GTE Cal., Inc. v. FCC*, 39 F.3d 940, 945 (9th Cir.1994) ("To satisfy the Article III case-or-controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision.... Where events have occurred that prevent us from granting effective relief, we lack jurisdiction and must dismiss the appeal." (internal quotation marks and citations omitted)).

Assuming the ERISA violations at issue regarding the 1999 Transaction warrant the equitable relief requested—the cancellation or redistribution of JDS preferred shares—such relief would only provide benefits to HolliShare beneficiaries prospectively. Because none of the plaintiffs still have an account with HolliShare, they could not possibly benefit from an order affecting HolliShare's current or future voting power in JDS shares.[37] *See Bendaoud v. Hodgson*, 578 F.Supp.2d 257, 267–68 (D.Mass.2008) (holding that a plaintiff who was no longer a participant in a defined contribution plan had no standing to seek purely prospective relief). Nor does the record indicate that other types of equitable relief, such as disgorgement or restitution, would redress the alleged injury in the absence of evidence that plan fiduciaries profited from the alleged violations at the plan's expense. *See Horvath v. Keystone Health Plan East, Inc.*, 333

to allow the trust to hold shares again. *See* 805 Ill. Comp. Stat. 5/12.56(a)-(b) (providing a shareholder of a non-public corporation with a cause of action to seek cancellation or alteration of the articles of incorporation if the directors or those in control of the corporation have acted "in a manner that is illegal, oppressive, or fraudulent").

36. In contrast, plaintiffs' claims based upon prohibited transactions, for example, are

premised on allegedly disloyal investment decisions and improper sales of HolliShare assets that, by definition, would have changed the value or composition of plaintiffs' accounts.

37. Nor are any of the plaintiffs employee-beneficiaries of the 1977 Schneider Trust who would be entitled to receive preferred shares. (2d Zwirner Decl. ¶ 41; Winn Decl. ¶ 37.)

F.3d 450, 456 (3d Cir.2003) (holding that a plaintiff must demonstrate individual loss to have standing to seek restitution and disgorgement). Equitable relief simply would not "remove the harm" or otherwise provide plaintiffs with a tangible benefit.

■ Therefore, since neither revaluation of their accounts nor equitable relief will redress the ERISA violations at issue regarding the 1999 Transaction, plaintiffs "have no stake in the recovery and cannot satisfy the redressability requirement of constitutional standing." *Paulsen*, 559 F.3d at 1073. Furthermore, plaintiffs cannot satisfy the redressability requirement by purporting to seek relief on behalf of the plan as a whole. Though participants in an ERISA plan may, in general, seek relief on behalf of the plan, plaintiffs may only do so if they "otherwise meet the requirements for Article III standing." *Glanton*, 465 F.3d at 1127. Because plaintiffs do not have standing themselves to seek relief for the claims based on the 1999 Transaction, they cannot do so on behalf of HolliShare. Accordingly, the court must grant defendants' motion for summary judgment on the 1999 Transaction claims.[38]

### 5. *DeFazio–Ellis Divorce Proceedings*

DeFazio moves for partial summary judgment based on HolliShare's compliance with certain domestic relations orders ("DROs") issued by the Sacramento Superior Court presiding over the DeFazio–Ellis divorce proceedings. He argues that these orders did not satisfy the requirements of a "qualified domestic relations order" ("QDRO") as that term is defined in

29 U.S.C. § 1056(d)(3)(D), and that by complying with those orders, HolliShare fiduciaries breached their duties under § 1104(a)(1)(D) to administer the plan in accordance with the terms of the plan instrument. (Docket No. 474 at 4:10–13.)

Though pension benefits may not, in general, be assigned or alienated, 29 U.S.C. § 1056(d)(1), ERISA authorizes certain state court-ordered assignments of plan benefits to former spouses and dependents. Section 1056(d)(3) provides that pension plans "shall provide for the payment of benefits in accordance with the applicable requirements of any [QDRO]." QDROs are a type of domestic relations order, which relate "to the provision of child support, alimony, or marital property rights to a spouse, former spouse, child, or other dependent of a plan participant ... made pursuant to a State domestic relations law." *Id.* § 1056(d)(3)(B)(ii). A DRO is a QDRO if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or part of the benefits payable with respect to a participant under a[n ERISA] plan." *Id.* § 1056(d)(3)(B)(I). In addition, the DRO may not (1) require the plan to provide any type of benefit not otherwise provided, *id.* § 1056(d)(3)(D)(I); (2) require the plan to provide increased benefits, *id.* § 1056(d)(3)(D)(ii); or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO, *id.* § 1056(d)(3)(D)(iii).[39]

---

**38.** In light of the court's holding that plaintiffs lack constitutional standing to seek relief for the 1999 Transaction, the defendants' other arguments and plaintiffs' cross motion for partial summary judgment on claims related to the 1999 Transaction are moot.

**39.** A QDRO must also specify the name and mailing address of the alternate payee and the

affected plan participant, the amount or percentage of the participant's benefits to be paid or the means by which that amount will be determined, the number of payments or time period to which the order applies, and the plan to which the order applies. 29 U.S.C. § 1056(d)(3)(c). DeFazio does not contend that the DROs in question failed to satisfy these requirements.

These QDRO provisions are designed to provide simple, certain rules for plan administrators to follow. *See Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* —— U.S. ——, 129 S.Ct. 865, 874, 172 L.Ed.2d 662 (2009) ("And the cost of less certain rules would be too plain. Plan administrators would be forced to examine a multitude of external documents that might purport to affect the dispensation of benefits . . . ." (internal quotation marks omitted)); *Carmona v. Carmona,* 544 F.3d 988, 999 (9th Cir.2008) (noting that the QDRO requirements "allow a plan administrator to more easily administer the plan and reduce the risk of making improper payments").

■ Here, DeFazio argues that the Superior Court's March 2002 order violated certain requirements of a QDRO. That order provided that HolliShare was to segregate DeFazio's community property share of Ellis's HolliShare account, but further specified that Ellis "shall have a lien and security interest in [DeFazio's] share for unpaid child support." (Req. Judicial Notice Ex. G at 3.) The court consequently retained jurisdiction over DeFazio's share and ordered the HolliShare administrator to retain possession of $1,500,000 of DeFazio's account pending further order of the Superior Court. (*Id.*) DeFazio contends that this order violated § 1056(d)(3)(D)(i) because it did not allow the HolliShare administrator to immediately distribute the balance of DeFazio's alternate payee account in accordance with the terms of the Trust Instrument. (Docket No. 474 at 3:7–16.) In particular, section 9.01(3)(d) of the Trust Instrument provides that, for an alternate payee account exceeding $5,000, the account "shall be distributed upon the earliest to occur of (I) the date directed in the QDRO, (ii) the date selected in writing by the Alternate Payee, or (iii) the 'earliest retirement age' (as defined in [26 U.S.C. § 414(p)]) of the Participant from whose Account the Alter-

nate Payee's Account was created." (Trust Instrument 33.) Section 414(p)(4)(B) in turn defines an employee's "earliest retirement age" as the later of age fifty or the earliest date on which the participant could start receiving benefits under the plan if the participant separated from service.

It is undisputed that Ellis was over the age of fifty at the time of the March 2002 order, and she could have received benefits under the terms of the plan if she had terminated her employment. (*See* Req. Judicial Notice Ex. G at 1 (noting Ellis's year of birth as 1951); Trust Instrument § 8.02 (providing that a Hollister employee's account fully vests after seven years of employment).) Thus, DeFazio was entitled to an immediate distribution of his account under section 9.01(3)(d) of the Trust Instrument. Nevertheless, the March 2002 order did not violate § 1056(d)(3)(D)(i), which provides that a DRO meets the requirements of a QDRO only if it "does not require a plan to *provide* any type or form of benefit . . . not otherwise provided under the plan." 29 U.S.C. § 1056(d)(3)(D)(i) (emphasis added). The plain language of this provision only bars a QDRO from requiring a plan to affirmatively afford a type or form of benefit not established under that plan. *See Patton v. Denver Post Corp.,* 326 F.3d 1148, 1152 (10th Cir.2003) ("For example, benefits of a type or form not otherwise provided is best understood as referring to a lump sum payout rather than regular payments over a period of years."); *see also, e.g., Dickerson v. Dickerson,* 803 F.Supp. 127, 134 (E.D.Tenn.1992) (holding that a divorce decree was not a QDRO because it ordered the payment of retirement benefits before the time authorized under the terms of the plan).

The effect of the March 2002 order was simply to delay the timing of DeFazio's

distribution described in section 9.01(3)(d) of the Trust Instrument. Though the HolliShare administrator could not have delayed the distribution under the terms of the Trust Instrument alone, to do so in accordance with a DRO did not require the administrator to affirmatively provide DeFazio with a form or type of benefit to which DeFazio would not have otherwise been entitled. The failure of the March 2002 order to provide for the immediate distribution of DeFazio's alternate payee account therefore did not violate § 1056(d)(3)(D)(i).

Alternatively, DeFazio argues that the March 2002 order was inconsistent with the distribution methods of the Trust Instrument because it "contemplated a series of distributions for child support." (Docket No. 474 at 3:17–18.) Section 9.01(1) of the Trust Instrument provides participants, former participants, and alternate payees with only limited forms of payment, including lump sum single cash payment, direct rollover to an eligible retirement plan, certain annuities, and combinations of the three. While DeFazio accurately identifies that section 9.01(1) does not allow periodic payments from a HolliShare account, the March 2002 order itself did not order such payments. The order only specified that the HolliShare administrator was to retain possession of DeFazio's account pending future order of the Superior Court. It may have "contemplated" multiple payments from DeFazio's account in the future, but it did not order that HolliShare provide them. DeFazio's alternative argument that the March 2002 order violated § 1056(d)(3)(D)(I) thus also fails.

■ Finally, DeFazio argues that the DROs subsequently issued pursuant to the March 2002 order violated § 1056(d)(3)(D)(iii), which provides that a DRO qualifies as a QDRO only if it "does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order." He contends that the subsequent DROs concerning DeFazio's child support obligations ordered payments from DeFazio's account to DeFazio's children—i.e., other alternate payees. (Docket No. 474 at 4:1–8.)

This argument misconstrues the terms of the subsequent DROs. Those DROs ordered HolliShare to make payments from DeFazio's alternate payee account directly to Ellis. (*See, e.g.,* order dated August 5, 2002 at 2 ("Plan Administrator shall distribute the amounts set forth above to Petitioner [Ellis]").) Though the payments satisfied DeFazio's child support obligations, they were not paid to the children as alternate payees. Rather, the subsequent DROs simply adjusted the division of Ellis's HolliShare account between Ellis and DeFazio. DeFazio's argument that the subsequent DROs violated § 1056(d)(3)(D)(iii) is thus not supported by the terms of those orders.[40]

Though there is an absence of a genuine issue of material fact, DeFazio has failed to show that he is entitled to judgment as a matter of law on his claims based upon HolliShare's compliance with the Superior Court orders. Accordingly, the court must deny his motion for partial summary judgment.[41]

---

**40.** Because the issue has not been presented by the instant motion, the court does not hold that the March 2002 order or the subsequent DROs were in fact QDROs under ERISA.

**41.** In light of the court's holding that DeFazio has failed to show that he is entitled to judg-

ment as a matter of law, the court does not reach defendants' arguments concerning the applicability of collateral estoppel, judicial estoppel, the *Rooker–Feldman* doctrine, or the *Colorado River* doctrine.

### 6. *Liability Amendments to JDS and Hollister Articles*

Plaintiffs also move for partial summary judgment on a factual basis unconnected to the 1999 Transaction, prohibited transactions, or the DeFazio–Ellis divorce proceeding. (Docket No. 479 at 13:7–16). Plaintiffs contend that certain amendments to the JDS Articles and the Hollister Articles of Incorporation violate ERISA, which provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a).

■■■ The amendments to the corporate articles at issue state that "[n]o director of the Corporation shall be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director." (JDS Articles 45; Pls.' Stmt. Disputed Facts Ex. Z at 11.) By their terms, these provisions are expressly limited in scope to a director's liability "as a director" to the corporation or shareholders. They do not purport to limit the liability of the directors as ERISA fiduciaries to an ERISA plan, beneficiaries, or participants. While these provisions might limit a suit by HolliShare as a shareholder against Hollister or JDS directors, they do not limit such suits to the extent they are based on breaches of ERISA duties. Accordingly, 29 U.S.C. § 1110(a) does not render these provisions void as against public policy.

### C. *Plaintiffs' Motion to Remove the Plan Trustees*

In addition to their motion for partial summary judgment, plaintiffs also request that the court order the removal of the HolliShare trustees and appoint a neutral trustee to manage HolliShare's assets. (Docket No. 475 at 2:28–3:2.) Such removal constitutes a form of prospective equitable relief. As described earlier, *see supra* Section II.B.4, plaintiffs have no standing to seek prospective relief on behalf of themselves or HolliShare. Accordingly, the court must deny plaintiffs' motion to remove the plan trustees.

IT IS THEREFORE ORDERED THAT:

1) Defendants motion to strike plaintiffs' class action allegations (Docket No. 495) be, and the same hereby is, GRANTED;

2) Defendants' motion for partial summary on claims barred by the statute of limitations (Docket No. 483) be, and the same hereby is,

A) GRANTED in part with respect to claims related to the 1978, 1980, and 1984 amendments to the JDS Articles; non-§ 1105(a)(3) claims related to the 1999 amendments; DiMaro's, Humphries', and Seay's non-§ 1105(a)(3) claims related to the valuations of individual accounts using the book value method; Ellis's claims related to the valuations of her account using the book value method; and the dismissal of Gunderson as a defendant; and

B) DENIED in all other respects;

3) Defendants' motion for partial summary judgment on the fiduciary status of the Hollister Board and JDS (Docket No. 484) be, and the same hereby is, DENIED;

4) Plaintiffs' motion for partial summary judgment on claims related to the prohibited transactions and 1999 Transaction (Docket No. 477) be, and the same hereby is, DENIED;

5) Defendants' motion for partial summary judgment on the claims related to the 1999 Transaction (Docket No. 489) be, and the same hereby is, GRANTED;

6) DeFazio's motion for partial summary judgment on claims related to the divorce proceedings (Docket No. 474) be, and the same hereby is, DENIED; and

7) Plaintiffs' motion to remove the plan trustees (Docket No. 475) be, and the same hereby is, DENIED.

As discussed at the June 22, 2009 hearing, within ten days of the date of this Order, the parties shall agree upon and submit to the court a proposed trial date.

IT IS SO ORDERED.